323 P.3d 95

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**Paul C.K. KAEO, Petitioner/Defendant–Appellant.**

**No. SCWC–12–0000007.**

Supreme Court of Hawai'i.

Feb. 28, 2014.

Randall K. Hironaka, Honolulu, for petitioner.

Stephen K. Tsushima, Honolulu, for respondent.

NAKAYAMA, ACOBA, McKENNA, and POLLACK, JJ., with RECKTENWALD, C.J., dissenting.

Opinion of the Court by POLLACK, J.

This case raises the question of whether the trial court erred in failing to instruct the jury upon the offense of assault in the first degree as an included offense of the charge of murder in the second degree.

The circuit court in this case declined to instruct the jury on the defense's requested instruction on assault in the first degree. The jury returned a verdict of manslaughter, and the Intermediate Court of Appeals (ICA) affirmed the circuit court's judgment.

We conclude that assault in the first degree is an included offense of murder in the second degree, and the circuit erred by not instructing the jury upon the included offense of assault in the first degree. Accordingly, we vacate the ICA's and circuit court's judgments, and remand for a new trial.

I.

A.

1.

Paul Kaeo (Paul) was charged with murder in the second degree pursuant to Hawai'i Revised Statutes (HRS) § 707–701.5 (1993). The following facts were adduced at trial.[1]

Paul met his future wife Debbie Baker Kaeo (Debbie) in 1989. They were married on June 6, 1998. Around the end of 2008, Debbie and Paul moved into the home of Debbie's mother, Lucille Baker (Lucille), where they lived together with Lucille and Debbie's brother, Calvin Baker (Calvin), until February 2009. In February 2009, Paul learned that Debbie was seeing Charles Kahumoku (Charles) and Debbie moved out. Debbie testified that she moved in with

---

1. The Honorable Karen S.S. Ahn, presiding.

Charles. At that time, Debbie was working for Roberts Hawaiʻi as a bus driver.

Despite their separation, Debbie and Paul continued to communicate from February to May 2009, usually after Debbie and Charles got into arguments. On direct examination, Debbie testified that Paul would get upset during these conversations and threaten to kill Charles. On cross-examination, however, Debbie stated only that she "assum[ed]" Paul had once threatened to kill Charles during these conversations and that she could not remember mentioning Paul's threats against Charles to anyone. Debbie also testified that she could not remember Paul ever asking where Charles lived.

Calvin also stated that Paul had said he would kill Charles "if he found him." On cross-examination Calvin stated that he never told his sister about Paul's threats. Calvin also confirmed that it was possible Paul actually said "he don't know what might happen" if Paul ever saw Charles, and not that he would kill Charles.

Paul denied ever telling Calvin that he would kill Charles. Paul admitted saying to Calvin that Paul "never like see [Charles] because I don't know what might happen." Paul testified that he still loved Debbie and would take her back if she wanted him back. Paul acknowledged that he did not like Charles after he found out Charles was sleeping with Debbie.

Paul testified that Debbie complained to him about Charles' drinking, mood swings, and his overprotectiveness of her. Debbie and Paul testified that sometime around the end of March or beginning of April 2009, Debbie called Paul "for advice" because Charlie had threatened to shoot her. Paul testified that it sounded as if "[Debbie] was in the room, and [Charles] was locked out, and I could hear him, like, pounding on the door and saying that he going kill her if she leave him." Paul stated that Debbie asked him at that time to pick her up, but he was at the beach with Calvin, had no car, and Calvin would not lend him his car.

Paul testified that after Debbie called him, he left a message on Charles' phone asking "why [Charles] hitting on [Debbie][?]"

Charles called Paul back, and Paul told him "he gotta stop, stop hitting her or for sure she's gonna leave him." Paul told Charles he could hear him threaten to kill Debbie. At that point, according to Paul, Charles started yelling and swearing at him and Charles said "you know what, I see you on the street, I'll shoot you too." Paul testified that he then hung up the phone because he was scared.

Paul testified that another incident of Charles abusing Debbie occurred a few weeks later in the middle of April. Debbie admitted that this incident occurred at a bar near the airport where Debbie and Charles were having drinks with friends. Debbie testified that she did not understand why Charles became angry during this incident. However, Paul testified that Debbie said to him that "she started talking to this guy at the bar and [Charles] got jealous." Debbie testified that after Charles got upset she went to the women's bathroom. Charles followed her into the bathroom and then hit her in the back. Another person in the bathroom came out of a stall and told Charles to stop and get out. Debbie testified that she got scared and called Paul.

Paul testified that he was at work on a night shift that lasted from 10 p.m. to 6 a.m. when Debbie called and told him what had occurred. Paul told her to come over to his workplace. Debbie testified that she ran over to Paul's workplace, which was near the bar, because she did not want to get hit again and was afraid she would.

Paul testified that when Debbie arrived, he had to open a gate at his workplace to let her in. At that point, Debbie and Paul saw Charles driving by Paul's workplace in a truck. Paul testified that Debbie stayed at his workplace for a couple hours while he worked and then she left. Paul testified that when Debbie left, she went back to the bar to meet Charles.

Paul testified further that he saw Debbie again the next day at Lucille's house. According to Paul, Debbie said "she hate when Charlie do this kind of stuff when—because he always do 'em when he drunk." Paul testified that Debbie then pulled down the collar of her turtleneck and showed him "a bruise like someone choked her." The bruise

was not present when Paul saw her the night before. Paul told Debbie "you gotta do something about it because my hands are tied if you no like be with me[.]" Debbie denied that she went to her mother's house at this time or that these events occurred.

Despite these incidents, Debbie testified that while her relationship with Charles was not perfect, she was happy with him. She also stated that it was not "a hard choice choosing between Paul and Charles[.]" Debbie testified also that Paul never attempted to reconcile his relationship with her or tried to persuade her to get back into a relationship with him.

## 2.

Paul, Calvin, and Debbie all testified that on May 8, 2009, Paul and Calvin were at Lucille's house preparing for a family party or baby shower that was scheduled to take place the next day. Lucille was in California at this time. Paul testified that at approximately 9 a.m., Debbie called him and offered to come to the house and help with the cooking. Paul testified that he told Debbie to stay at home.

Debbie testified that on that day Charles picked her up after work and dropped her off at Lucille's around 4:30 p.m. Calvin testified that Paul was in the house and did not speak to Charles at this time. Paul testified that because he was almost done with the cooking he, Debbie, and Calvin just "[hung] out" outside the house in the garage/driveway. Calvin testified they drank beer. Debbie confirmed that they spent the evening drinking beer and "talking stories" outside of the house in the garage/driveway.

Paul and Calvin testified that during the evening Debbie's relationship with Charles was discussed. Paul testified that Debbie said she was scared of Charles and "don't like when he's always mad at her." Paul and Calvin testified that they attempted to convince Debbie to stay over at the house for the night. Debbie said she would not mind, but she did not have a work uniform for the next day. Paul informed her she had an extra work uniform inside.

Debbie testified that Paul and Calvin brought up the issue of her relationship with Charles. Debbie testified that Paul and Calvin tried to convince her to stay over but that she "just wanted to go home." Debbie testified that Paul said she looked "scared" and that Paul knew "he threatening you," to which Debbie replied, "what you talking about? I no understand."

At this point, Paul and Calvin testified that they thought Debbie was going to stay over. Paul wanted Debbie to stay over because he "cannot see her getting beat—beaten every time." Calvin also testified that he spoke on the phone with Charles and told him that Debbie was going to stay over. Calvin testified that Debbie did not want to go home or go with Charles.

Debbie and Paul testified that at some point in the evening, Debbie left the house to get pupus but forgot her cellular phone at the house. Paul testified that while Debbie was gone, Charles called her phone. Paul answered the phone and said "lose the number" and then hung up. Charles called back a few minutes later and Paul answered again. This time Paul explained that Debbie was going to stay over for the night and Calvin would drive her to work and pick her up. Paul testified that at this point Charles "started swearing and stuff like that and he told me that don't interfere with my life, I going kill you." That made Paul scared for himself and Debbie. Paul testified that he was scared for Debbie because "if she do go home, who knows what he might do. I don't know what he's capable of."

Debbie testified that when she returned she noticed that she had a missed call. Paul told Debbie that Charles had called. Debbie did not think it was a "big deal." Debbie then went into the house. Debbie called Charles and asked him to pick her up. Debbie wanted to go home at about 9:30 p.m. because she had work the next day.

Paul testified that at about 9:00 p.m. or 9:30 p.m. Charles arrived at Lucille's house in his truck. Paul testified that he did not know Charles was coming. Calvin also testified that he did not know Charles was coming and was surprised when he showed up.

Paul testified that Debbie stood up to leave and he pushed her back down. Debbie testified that she stood up, hugged both Calvin and Paul goodbye, "was ready to walk out the gate," and then was "flown back" onto the grass behind the garage by Paul. Calvin testified that Debbie never stood up. Paul testified that he said to Debbie "you're not going home with this guy tonight." According to Debbie, Paul said " 'You ain't'—'you ain't fucking leaving.' "

Paul testified that the reason he pushed Debbie down was because something might happen to her. Paul testified further that, as a result of the conversation he had with Charles about Debbie staying over and Charles threatening to kill Paul, Charles might be mad and drunk enough to kill Debbie and thus he "feared for her life."

Paul testified that he next walked into the street toward Charles' truck. Paul told Charles "[Debbie] going stay over I told you, you know, just go home and pick her up at work." Paul testified that Charles started "yelling and stuff like that," but Paul could not hear him because Charles was in the truck. Paul grabbed a "pipe," [2] which Calvin described as the rebar they used to keep the gate closed so as to keep the dogs in the yard and "started smashing on [Charles'] car." Paul smashed the windshield first, then the passenger side window. Debbie testified that she attempted to grab the bar out of Paul's hand but Paul shoved her down again. Paul testified that he pushed Debbie down and told her to stay away. He also testified that he was not jealous and the attack was "like trying to keep her safe, protect—protecting her." Paul testified that he "never like ... something happen to her" "[b]ecause [Charles] was hurting Debbie."

Calvin testified that he could not understand anything Paul was saying. Debbie testified that while Paul was smashing Charles' car, Paul said "he going kill him" "many times." Debbie noticed that Charles looked scared and was not attempting to get out of the car. After hitting Charles' car a number of times, Paul testified that he "went onto the driver's side and started jabbing [Charles]." Debbie testified that as Paul walked around the truck to the driver's side, Paul said "I going kill him." Debbie testified that during this time she was "screaming and yelling" "stop, just stop." Debbie testified that she called the police three times while she was trying to stop Paul from hurting Charles.

On cross-examination, Debbie acknowledged that she did not mention Paul saying he would kill Charles while Paul was hitting Charles' car in her written statement or in her half-hour interview with the detectives, and she did not remember telling this to the grand jury. Debbie testified that she told the prosecuting attorney in the case about what Paul said on at least one occasion.[3]

Paul testified that he jabbed Charles through the open driver side window. Paul stated that he never opened the door while he was jabbing Charles with the bar. Calvin testified that he saw Paul "poking" Charles with the bar while Charles was inside the truck.[4] Paul testified that at this point he was only trying to hurt Charles and not kill him:

[DEFENSE COUNSEL]: Okay. When you were jabbing into there, what were you trying to do, Paul?

[PAUL]: I was trying to hurt him.

---

2. Debbie at first described it as a "pipe or something." Debbie identified State's Exhibit 1 as the object in Paul's hand that evening. Debbie described it as a peg made out of metal used for holding up tents while camping. An evidence specialist (Specialist) with the Honolulu Police Department's Scientific Investigation Section recovered a two-foot metal bar that was depicted in State's Exhibits 19 and 29. Calvin identified the bar in State's Exhibit 19 as the one from Paul's hand.

3. After Debbie's testimony concluded, Defense Counsel stated on the record, out of the presence of the jury, that at no time did the prosecutor's office disclose that Debbie had said that Paul said "I going kill him," referring to Charles. The Prosecutor related that he could not remember and did not know of these statements by Paul prior to that day in court.

4. Debbie testified that she again tried to get the bar out of Paul's hand again and Paul pushed her down a third time. Paul testified that Debbie was not around. Debbie testified that she did not know where Calvin was at this point.

[DEFENSE COUNSEL]: Okay. But, I mean, why?

[PAUL]: Because he was hurting Debbie.

[DEFENSE COUNSEL]: Okay. You said earlier you pushed down Debbie because you were afraid for her?

[PAUL]: Yes, I was afraid for her.

[DEFENSE COUNSEL]: Okay. When you're jabbing the bar into the truck, you still afraid for her?

[PAUL]: Yes.

[DEFENSE COUNSEL]: Okay. Were you trying to kill him?

[PAUL]: No.

[DEFENSE COUNSEL]: You weren't trying to kill him?

[PAUL]: No.

[Defense Counsel]: Okay. What were you trying to do, Paul, I mean, what—

[PAUL]: I was just trying to stop him from, you know, taking her and, who knows, beating her, stuff like that.

[DEFENSE COUNSEL]: Did you, I guess, at any time think about the kind of injuries that you wanted to inflict?

[PAUL]: At that time I wasn't thinking. My mind was just—

[DEFENSE COUNSEL]: Okay. But you know you weren't trying to kill him?

[PAUL]: Yes.

[DEFENSE COUNSEL]: You were trying to hurt him though?

[PAUL]: Yes.

[DEFENSE COUNSEL]: Okay. But you don't remember how much?

[PAUL]: No.

Paul admitted he knew hitting someone in the head with the bar he hit Charles with could be dangerous, but he denied aiming for Charles' head, stating that he "just swung wild" and "was just jabbing wild[.]" Paul also admitted hitting Charles "out of anger[.]"

Paul testified that he stopped hitting Charles when he saw Charles "go down." Paul could not hear Charles breathing or any "gurgling sounds." Paul also testified that he "couldn't see blood." Paul and Calvin testified that at this point Calvin came up behind Paul and "told 'em enough already."[5] Both testified that Calvin took the bar from Paul. Calvin testified that he threw the bar over the car.

Paul testified that he said to Calvin that he should take Charles to the hospital because he knew he "beat him real bad." Paul said "I need to do something to help this guy, what I did." Paul then tried to push Charlie over so he could "get in and go." Paul testified that at this point Debbie came up and took the keys out of the ignition of the truck. Paul admitted that he never actually told Debbie he was planning to take Charles to the hospital.

Debbie testified that when Paul opened the driver's side door, Charles was slouched over the steering wheel. She testified further that Paul then said "Fuck you. Get away. I going take him. I going take him." Debbie testified that Paul was trying to start the truck. Debbie took the keys out of the truck to prevent Paul from taking Charlie because Debbie was worried about Charlie. Paul and Debbie testified that Paul ran away after Debbie took the keys. Debbie testified that Charles had a pulse and was breathing at this time. According to Debbie no emergency personnel showed up for ten more minutes. Paul denied knowing Charles was dead on the night of the incident.[6]

Jeffery Jacobson (Jacobson), who responded to the incident, testified that he arrived on

---

5. A neighbor (Neighbor), who was twenty yards away across the street, testified that he went outside when he heard commotion in the street. He saw Charles' truck drive up, saw the door open, and saw someone go into Charles' truck from the driver's side and that "most of their body was into the truck maybe with their leg still out hanging on the street." Neighbor testified that it seemed like a fight was happening in the truck and there was a pounding sound. Neighbor also heard what sounded like a woman trying to break up the fight. Neighbor testified that he went back inside five minutes later, "maybe ten at the most." Neighbor stated that he heard no breaking glass and did not see anyone strike the truck. Neighbor said it was very dark and they went back inside because they did not want to intrude on a family issue.

6. Paul acknowledged that he was the person who killed Charles.

the scene in an ambulance at about 9:50 p.m. Jacobson testified that the passenger window "looked shattered" and the windshield of Charles' truck was damaged. He then noticed that Charles' "feet were above the steering wheel ... and he was lying at an angle down where his head was in the passenger seat[.]" Jacobson checked Charles' pulse but "no pulse was indicated." Charles also was unresponsive and not breathing. He attempted to revive Charles with CPR and adrenalin, but Charles did not return to spontaneous respirations or spontaneous pulse. Jacobson took Charles to Waianae Coast Comprehensive Health Center, the nearest appropriate facility. Dr. Gayle Suzuki (Dr. Suzuki),[7] a medical examiner, testified that Charles was pronounced dead on May 8, 2009.

Dr. Suzuki testified that on May 10, 2009, she conducted an autopsy of Charles. She identified numerous external wounds to Charles' head, such as bruises and scrapes on the middle part of his forehead, a scrape over his right eyebrow and a bruise by his right eye. Charles also had a broken nose and circular cuts on his nose and below his left jaw. Dr. Suzuki testified that the external head wounds alone were not fatal.

On his torso, Charles had a "semicircular scrape" to the left side of his chest, scrapes and bruises on his back shoulder blades, along the back of his forearm and a "seven inch ... bruise on the left side of his torso[.]" Charles had no external injuries from the waist down. Dr. Suzuki testified that Charles' wounds were consistent with Charles being attacked from the left side. She described many of the arm wounds as defensive type injuries.

Dr. Suzuki also determined that there were internal injuries to Charles' head. She described these injuries as "rotational type injuries" resulting in a "shearing and stretch-

ing of the brain cells itself." Dr. Suzuki testified that these rotational type injuries could result in a range of injuries, from concussions to death. In this case, the shearing resulted in bleeding around blood vessels on the brain, which indicated an injury to the brain. Dr. Suzuki testified that these injuries were caused by blunt force trauma, which was the cause of Charles' death. She testified that there was no skull fracture, but external injuries would not necessarily occur even where a person died from blunt force trauma to the head.

Dr. Suzuki testified that Charles had a blood alcohol concentration (BAC) of .221. She stated that Charles' head injury alone was sufficient to cause his death and that even without the alcohol in his system, Charles would have died. [*Id.*]

On cross-examination, Dr. Suzuki discussed alcohol concussion syndrome (ACS). She described ACS as a "mechanism" that caused persons with BACs from .22 to .33 to suddenly stop breathing and die after suffering an otherwise non-fatal blow to the head. She stated, however, that the prior cases of ACS, unlike the instant case, did not involve physical damage to the brain itself. Dr. Suzuki testified that she could not rule out alcohol as a factor contributing to Charles' death, but she still believed "to a reasonable medical degree" of certainty that even without the alcohol, Charles would have died. However, she conceded that she was not "a hundred percent absolute[ly]" certain that a person with Charles' injuries and no alcohol in their system would also have died.

### B.

Prior to trial, Paul submitted Defendant's Requested Jury Instructions numbers 5 and 6 on assault in the first degree [8] and assault

---

7. Dr. Suzuki was offered as an expert "in the field of anatomical, clinical and forensic pathology, qualified to give opinions on things like manner of death, mechanism of injury, etcetera."

8. Defendant's Jury Instruction No. 5 reads as follows:

> If and only if you find Paul Kaeo not guilty of Manslaughter, or you are unable to reach a unanimous verdict as to this offense, then you

must consider whether the defendant is guilty or not guilty of the included offense of Assault in the First Degree.

A person commits the offense of Assault in the First Degree if he intentionally or knowingly causes serious bodily injury to another person.

There are two material elements to the offense of Assault in the First Degree, each of

in the second degree.[9]

Before testimony began, the parties and the court discussed jury instructions. The court "reserved" the issue of whether to give Defendant's Requested Jury Instructions numbers 5 and 6. Later that day the court informed the parties that the court would not be submitting to the jury the assault in the first degree instructions, which the court initially had included in its own instructions. The defense objected, noting that Paul had requested both assault in the first degree and assault in the second degree. The defense argued that under HRS § 701–109(4)(a) or (c), but especially (c), the court should give instructions for both assault in the first degree and assault in the second degree. The defense contended that this case "exactly" fits the description of an "included" offense in HRS § 701–109(4)(c), which the defense described as one that "differs from the offense charged only in the respect that a less serious injury or different state of mind suffices to establish its commission."

The prosecution argued that assault in the first degree not be given. The prosecution contended that assault in the first degree would "have to go through a manslaughter verdict or analysis," which requires a reckless state of mind and assault in the first degree has an intentional or knowing state of mind.

The court based its decision not to give the assault instruction on *State v. Robinson*, 82 Hawai'i 304, 922 P.2d 358 (1996) and *State v. Alston*, 75 Haw. 517, 865 P.2d 157, (1994).

The court characterized the holding in *Robinson* as "you don't get an assault third lesser off an assault one unless there is a rational basis to find that the injury did not constitute serious bodily injury but actually in fact constituted bodily injury." The court read *Alston* to hold that HRS § 701–109(4)(c) "generally require[s] the same end result." The court concluded that when *Alston* and *Robinson* are "combined" they "seem to suggest" that "when it comes to murder and a dead person . . . you cannot get to a different injury, which is pure injury, serious bodily injury, substantial bodily injury." The court accordingly based its decision not to include the proposed assault instructions solely on its interpretation of the law and not based on the facts presented at trial.

Thus, the court gave instructions to the jury on murder in the second degree, reckless manslaughter, and extreme mental or emotional disturbance manslaughter. During closing arguments the defense argued that if the jury believed Paul only assaulted Charles and did not intend to kill him, the jury should find Paul not guilty because they had not been instructed on assault. The Court interrupted the defense to say that assault was not a consideration:

[DEFENSE COUNSEL]: Now, if you say, no, it wasn't a jealous rage, you gotta—the other path you gotta look at, and this is actually probably where you're supposed to start, okay, is same thing. Okay? Was it murder? If it wasn't murder, was it manslaughter? Okay.

A person commits the offense of Assault in the Second Degree if he intentionally or knowingly causes substantial bodily injury to another person.

There are two material elements to the offense of Assault in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1. That, on or about May 8, 2009, in the City and county of Honolulu, State of Hawai'i, the Defendant caused substantial bodily injury to another person; and

2. That the Defendant did so intentionally or knowingly.

which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1. That, on or about May 8, 2009, in the City and county of Honolulu, State of Hawai'i, the Defendant caused serious bodily injury to another person; and

2. That the Defendant did so intentionally or knowingly.

9. Defendant's Jury Instruction No. 6 read as follows:

If and only if you find Paul Kaeo not guilty of Assault in the First Degree, or you are unable to reach a unanimous verdict as to this offense, then you must consider whether the defendant is guilty or not guilty of the included offense of Assault in the Second Degree.

Now, generally speaking, you guys know where this line goes, right? There's—I mean, you know, there's assaults but you have no instructions for assaults so you cannot consider any kind of assault. Okay? So even if you say to yourselves, and this is just an assault, I mean, I don't think he intended to kill him or anything like that, I don't think he acted recklessly, that's an assault. But you don't have an instruction, okay? So that would mean you're here, okay? You're not guilty. Now if anywhere along this line you stop, you say, okay—

THE COURT: Assault is not to be—assault is not a consideration.

[DEFENSE COUNSEL]: That's right. That's what I said. Okay. So if you stop anywhere along this line, you say murder or manslaughter, then you gotta consider the defenses that were raised. Okay?

(Emphasis added).

On August 8, 2011, the jury convicted Paul of reckless manslaughter. On December 5, 2011, the court sentenced Paul to twenty years imprisonment with a mandatory minimum of six years and eight months. Paul appealed to the ICA.

C.

Paul raised a single relevant[10] point of error on appeal to the ICA: the lower court erred in refusing to submit defendant's requested jury instructions regarding the included offense of assault in the first degree.

Paul argued that the jury should have been instructed on assault in the first degree pursuant to HRS § 701-109(4)(c) because "assault 'differs from [murder] only in the respect that a less serious injury or risk of injury to the same person ... suffices to establish its commission.'" (Emphasis added-

ed). Paul contended that the commentaries to the Model Penal Code (MPC) supported this argument as the MPC commentaries specifically state that "Paragraph (c) allows conviction of an offense consisting of an intentional infliction of bodily harm where the charge is intentional homicide[.]" Thus, "[t]he fact that the defendant's conduct caused an injury which resulted in death does not preclude Assault as an included offense."

Paul further argued that the court erred in its interpretation of Alston's "end result" analysis because "death is a form of injury," and thus assault and Murder could have the same "end result." Paul reasoned that "the issue of the included offenses turns on whether the evidence supports a rational conclusion that the defendant did not intentionally or knowingly cause a death, but instead, acted with the state of mind to commit assault." Paul maintained that "[u]nder the principles of criminal law, an individual cannot be adjudged guilty without proof that he acted with the requisite criminal mens rea to cause the prohibited harm or injury," and "[t]he penal law does not, in most instances, condemn a person's conduct alone." Paul stated that there was "a rational basis for concluding that he did not contemplate killing [Charles], and thus he is entitled to the requested instructions on Assault." Paul maintained that HRS § 701-109(4) does not indicate in any way that the "end result, in this case death, controls the included instructions that are given."

Paul distinguished Robinson, which involved a dispute over whether the defendant caused the injuries and not a dispute as to the defendant's state of mind. In this case, by contrast, the central question is whether the evidence supports a finding that Paul

---

10. As part of his first point of error raised to the ICA, Paul also contended that the lower court erred in refusing to submit defendant's requested jury instructions on assault in the second degree. In light of our determination that the jury should have been given an instruction on assault in the first degree as a lesser included of murder in the second degree, it is unnecessary to discuss this argument.

Paul raised two additional points of error to the ICA. First, "The lower court abused its discretion by refusing to allow evidence of the familial relationship between the decedent and the State's primary witness." This point is not raised in the Application. Second, the circuit court violated his "constitutional right to present a complete defense by precluding [his] attorney from arguing this was an assault case." In light of our disposition of Paul's primary argument in the Application, it is unnecessary to discuss this issue.

only intended to assault Charles and not kill him.

The prosecution responded that the trial court need not instruct the jury on a lesser included offense "unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." The prosecution argued that Paul admitted trying to hurt Charles because Charles was hurting Debbie and Paul admitted causing the injuries to Charles and to killing Charles. Paul admitted that "At that time I wasn't thinking. My mind was just —." Paul knew "hitting somebody in the head with the bar can be dangerous and deadly." Finally, Paul admitted that "he 'just swung wild,'" at any part of Charles' body and "beat [Charles] real bad" because Paul was angry. The prosecution concluded that based on this evidence "there was no rational basis to support the contention that the jury could have rationally acquitted Defendant of Reckless Manslaughter and convicted him of [Assault in the First Degree]."

The ICA issued a Summary Disposition Order (SDO) affirming the circuit court judgment (judgment) relying on the holding in *State v. Haanio*, 94 Hawai'i 405, 16 P.3d 246 (2001), that "when the jury convicts the defendant of the charged offense or a greater included offense, a trial court's failure to instruct on a lesser included offense is a harmless error." [11]

## II.

In his Application for Writ of Certiorari, Paul raises a single [12] point of error:

The ICA gravely erred in holding that the circuit court's failure to instruct the jury on the lesser-included assault offenses was a harmless error.

## A.

The ICA affirmed the circuit court judgment solely on the grounds that, pursuant to *Haanio*, the court's failure to instruct on assault in the first degree was harmless because the jury convicted Paul of manslaughter. After the ICA issued its SDO, this court held that "*Haanio* is overruled to the extent that it holds the trial court's error in failing to give included offense instructions is harmless if the defendant was convicted of the charged offense or of a greater included offense." *State v. Flores*, 131 Hawai'i 43, 57 314 P.3d 120, 134 (2013).

In *Flores*, the issue was whether the trial court should have instructed the jury on unlawful imprisonment in the first degree when the defendant was charged with and convicted of the crime of kidnapping. *Flores*, 131 Hawai'i at 44, 314 P.3d at 121, 128. After establishing that unlawful imprisonment in the first degree was a lesser included offense of kidnapping and that the evidence in the case presented a rational basis for the jury to acquit Flores on kidnapping and convict him of unlawful imprisonment in the first degree, the *Flores* court held that the trial court's failure to instruct on unlawful imprisonment was not harmless simply because the defendant was convicted of the greater offense. *Flores*, 131 Hawai'i at 44–58, 314 P.3d at 121–135. Instead, the court held that there was a rational basis for the jury to find Flores guilty of unlawful imprisonment in the first degree, had the jury been given the appropriate instruction. *Id.* at, 314 P.3d at 135. Thus, "[t]he failure to instruct the jury on a lesser included offense for which the evidence provides a rational basis warrants vacation of the defendant's conviction." *Id.*

In this case, Paul was charged with murder in the second degree and convicted of the lesser included offense of reckless manslaughter. Pursuant to *Flores*, if assault in the first degree is a lesser included offense of

---

11. The ICA also found that the court's interruption of the defense's closing arguments concerning assault did not disturb or dispute Paul's theory that the jury "must acquit if they believe [Paul] did not act with the requisite intent for murder or manslaughter, and did not violate [Paul's] right to present a complete defense."

12. Paul also raises as a sub-point that his federal and Hawai'i constitutional rights to present a defense and to effective assistance of counsel were violated by the court's foreclosing his counsel from arguing to the jury the lesser included offenses of assault in the first degree and assault in the second degree.

murder in the second degree, and there was a rational basis in the evidence for acquitting Paul of murder in the second degree and convicting him of the included offense of assault in the first degree, then the court's failure to instruct on the included offense is subject to a harmless beyond a reasonable doubt standard.

## B.

"[A]n offense is a lesser included offense of another if it satisfies the requirements set forth in HRS § 701–109(4) which codifies the common law doctrine of lesser included offenses." *State v. Alston*, 75 Haw. 517, 532–33, 865 P.2d 157, 166 (1994) (quotations, citations, and brackets omitted). HRS § 701–109(4) provides in relevant part:

A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:

. . . .

(c) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.

HRS § 701–109(4) (1993). Each subsection of the statute "requires alternative analyses." *Alston*, 75 Haw. at 533, 865 P.2d at 166 (citing *State v. Burdett*, 70 Haw. 85, 87, 762 P.2d 164, 166 (1988)). In particular, subsection (c) "expands the doctrine of lesser included offenses to include crimes that require a . . . less serious injury or risk of injury." *Burdett*, 70 Haw. at 90, 762 P.2d at 167.

"The degree of culpability, degree of injury or risk of injury and the end result are some of the factors considered in determining whether an offense is included in another under HRS § 701–109(4)(c)." *State v. Kupau (Kupau* I), 63 Haw. 1, 7, 620 P.2d 250, 254 (1980). In this case, the degree of culpability, the end result, the degree of injury or risk of injury and the legislative history all strongly indicate that assault in the first degree is a lesser included offense of murder in the second degree.

### 1.

■ First, "[r]egarding the degree of culpability, the rule is that the lesser included offense cannot have a mental state greater than or different from that which is required for the charged offense." *Alston*, 75 Haw. at 534, 865 P.2d at 166. For example, in *Kupau I*, the court held that "harassment has a greater mental state than assault in the third degree" because "[h]arassment requires a state of mind that has the intent to harass, annoy or alarm, while assault requires a mental state that is intentional, knowing or reckless." 63 Haw. at 6, 620 P.2d at 254. Likewise, harassment "has a more culpable mental state than terroristic threatening in the first degree" because the latter "requires a mental state that is intentional or reckless." *Burdett*, 70 Haw. at 88, 762 P.2d at 166–167.

In both *Kupau I* and *Burdett*, the court noted that the Commentary on HRS § 702–208 states that intent, knowledge, recklessness, and negligence are in descending order of culpability. *Kupau I*, 63 Haw. at 6 n. 5, 620 P.2d at 253 n. 5; *Burdett*, 70 Haw. at 88–89, 762 P.2d at 167. Thus, the degree of culpability test refers to the state of mind—intentionally, knowingly, recklessly, or negligently—required to establish an element of an offense pursuant to HRS § 702–204.

■ In this case, murder in the second degree and assault in the first degree both require an intentional or knowing state of mind.

In *Alston*, the court held that terroristic threatening is not a lesser included offense of intimidating a witness, in part because the court determined that the "two offenses have 'different' mens rea requirements." 75 Haw. at 534, 865 P.2d at 166. The court first noted that terroristic threatening can be committed with the lesser mental state of recklessness, while intimidating a witness requires an intentional mental state. *Id.* Thus, terroristic threatening does not have a mental state <u>greater</u> than that required for intimidating a witness. However, the court held that the two offenses have "different" mental state requirements because "intimidating a witness requires the intent to cause another's absence from an official proceeding, and terror-

istic threatening requires the intent to cause, or recklessness in causing, terror." *Id.*

Murder in the second degree and assault in the first degree do not require "different" mental states under the *Alston* analysis. To prove the offense of murder in the second degree, the State must establish that "the person intentionally or knowingly cause[d] the death of another person." HRS § 707–701.5(a). To prove the offense of assault in the first degree, the State must show that the "person intentionally or knowingly cause[d] serious bodily injury to another person." HRS § 707–710(1).

Therefore, assault in the first degree does not have a mental state greater than or different from that which is required for murder in the second degree.

### 2.

Second, subsection (c) "provides that a crime can be a lesser included offense when a less serious injury or risk of injury to the same person is involved." *Burdett,* 70 Haw. at 91, 762 P.2d at 168. *See Kupau I,* 63 Haw. at 8, 620 P.2d at 254 (injury resulting from harassment is different from, and therefore not less serious than injury received from assault in the third degree, because "[a]lthough harassment requires a physical touching, [the statute] is concerned with the offensive nature of the touching to one's sensibilities").

■ Both murder in the second degree and assault in the first degree require that the person intentionally or knowingly cause physical harm to another. They differ in that assault in the first degree requires a "less serious injury or risk of injury to the same person," consistent with HRS § 701–109(4)(c). If a person "causes the death of another" under HRS § 707–701.5(a), then the person will necessarily have caused a "bodily injury which creates a <u>substantial risk of death</u>" under HRS §§ 707–710(1) and 707–700 (emphasis added). *See Young v. State,*

605 S.W.2d 550, 552 (Tex.Crim.App.1979) ("one cannot intentionally or knowingly cause the death of another without committing an act clearly dangerous to human life").[13]

"HRS [§ ] 701–109(4) has been taken almost verbatim from the Proposed Official Draft of the Model Penal Code, [§ ] 1.07(4) (1962)." *Kupau I,* 63 Haw. at 4, 620 P.2d at 252. The commentary to the Model Penal Code (MPC) § 1.07(4) expressly provides that "Paragraph (c) <u>allows conviction of an offense consisting of an intentional infliction of bodily harm where the charge is intentional homicide[.]</u>" MPC § 1.07 cmt. 5 (Revised Comments 1985) (emphasis added).

The MPC defines criminal homicide as "purposely, knowingly, recklessly or negligently caus[ing] the death of another human being." MPC § 210.1(1). Criminal homicide constitutes murder when "it is committed purposely or knowingly." MPC § 210.2(1). Under the MPC, purposely is equivalent to "intentionally" or "with intent." MPC § 1.13(12). *See* MPC § 2.02(2)(a) (defining general requirements of culpability).

Accordingly, the MPC formulation of murder is identical to the definition of murder in the second degree under HRS § 707–701.5 (intentionally or knowingly causing the death of another person). The MPC also defines "aggravated assault" as "purposely, knowingly or recklessly" causing "serious bodily injury," MPC § 211.1(2)(a) (Revised Commentaries 1980), similar to HRS § 707–710 (intentionally or knowingly causing serious bodily injury).

Thus, consistent with the MPC, HRS § 701–109(4) allows for a conviction of assault in the first degree where the charge is murder in the second degree. *See State v. Box,* 89 Ohio App.3d 614, 626 N.E.2d 996, 1000 (1993) (holding that "felonious assault," defined as "knowingly ... caus[ing] serious physical harm to another," is a lesser included offense of aggravated murder, defined as

---

**13.** The Hawai'i Penal Code is patterned after the Model Penal Code. *See State v. Gaylord,* 78 Hawai'i 127, 140 n. 22, 890 P.2d 1167, 1180 n. 22 (1995).

The Model Penal Code was also "highly influential" in the development of the Texas Penal Code. *See Thompson v. State,* 236 S.W.3d 787, 797 (Tex.Crim.App.2007) <u>and</u> *Brown v. State,* 955 S.W.2d 276, 284 (Tex.Crim.App.1997) ("Because the Legislature expressed an intent to model our Code after the Model Penal Code, we may also look to the Model Code for guidance.").

"purposely, and with prior calculation and design, caus[ing] the death of another").[14] *See also Hall v. State*, 163 Ga.App. 515, 295 S.E.2d 194, 195 (1982) (holding that aggravated assault with intent to commit murder may be charged as a lesser included offense of murder).[15]

Furthermore, finding that assault in the first degree is a less serious degree of injury or risk of injury than murder in the second degree is consistent with the concept that a defendant may act intentionally or knowingly with respect to the conduct, but not as to the result of the conduct. For example, in *State v. Kupau (Kupau II)*, 76 Hawai'i 387, 391, 879 P.2d 492, 496 (1994), overruled on other grounds by *State v. Haanio*, 94 Hawai'i 405, 16 P.3d 246 (2001), in the context of an assault case, the court explained that the defendant could have acted intentionally or knowingly with respect to his conduct, and the victim could have in fact suffered substantial bodily injury as a result thereof. However, if the defendant did not act intentionally or knowingly with respect to that result of substantial bodily injury, but only acted recklessly with respect to the result, then the defendant "may, depending upon the circumstances," only be guilty of the lesser included offense of assault in the third degree (requiring intentional, knowing or reckless state of mind) rather than the charged offense of assault in the second degree (requiring intentional or knowing state of mind).[16] *Id.* at 391–92, 879 P.2d at 496–97.

By the same reasoning, if there is a rational basis in the evidence to prove that the defendant acted intentionally or knowingly with respect to the conduct of causing serious bodily injury, but the defendant did not act intentionally or knowingly with respect to the result of death, then an assault in the first degree instruction should be given.

The circuit court in this case did not give the lesser included instruction on assault because murder results in death while assault does not result in death. However, as stated, in both situations, serious bodily injury was caused to another person; but in a murder prosecution, the serious bodily injury has resulted in death. It would be illogical for a court's submission of a jury instruction on assault in the first degree to depend upon the fortuity of the victim living or dying as a result of the same injuries. That is, in two situations the defendant could have the identical intent with respect to the conduct of causing serious bodily injury. However, if in one situation the victim receives medical assistance and lives, the jury is instructed on the lesser offense of assault in the first degree. In the identical situation, where the victim does not receive medical care and dies, the jury is not so instructed. Under the same reasoning, the timing of the trial could determine whether the instruction on assault is given, depending on whether the victim eventually succumbs to the injuries.

Accordingly, the offense of assault in the first degree differs from the offense of murder in the second degree only in the respect that a less serious injury (i.e. substantial risk of death versus death) suffices to establish its commission.

### 3.

Third, we consider the end result to determine whether an offense is included in

14. "Ohio's statutory definitions of criminal offenses in the Revised Code are based largely upon the American Law Institute's Model Penal Code." *State v. Brooks*, 44 Ohio St.3d 185, 542 N.E.2d 636, 641 (1989).

15. "[T]he present Criminal Code was based in large measure on the Model Penal Code." *Grace v. State*, 231 Ga. 113, 200 S.E.2d 248, 255 (1973).

16. The *Kupau II* court interpreted HRS § 707–711(1) (Supp.1992), which provided that a person commits the offense of assault in the second degree if the person "intentionally or knowingly

causes substantial bodily injury to another." *Kupau II*, 76 Hawai'i at 388, 388 n. 1, 879 P.2d at 493, 493 n. 1. HRS § 707–712 (1985) provided that a person commits the offense of assault in the third degree if the person "intentionally, knowingly, or recklessly causes bodily injury to another person." *Kupau II*, 76 Hawai'i at 388 n. 3, 879 P.2d at 493 n. 3.

The current statute provides, as it did on May 8, 2009, that assault in the second degree is committed if the person intentionally or knowingly causes substantial bodily injury to another, or if the person recklessly causes serious or substantial bodily injury to another. HRS § 707–711(1) (1993).

another. "The Commentary to HRS § 701–109 and this court in *Kupau* [*I*] indicated that the lesser included offense should produce the same end result as the charged offense." *Burdett*, 70 Haw. at 89, 762 P.2d at 167. The "end result" refers to the result of the criminal act. For example, negligent homicide has the same end result as murder under HRS § 701–109(c). Commentary to HRS § 701–109.

■ However, this court has never stated that the "end result" factor is dispositive. The end result is only one of the factors that can be considered in determining whether one offense is included in another. *See State v. Woicek*, 63 Haw. 548, 551, 632 P.2d 654, 656 (1981) ("some of the factors that can be considered in determining whether an offense is included in another are the degree of culpability, the end result and legislative scheme") (emphasis added).

In *Kupau I*, the court found that harassment and assault in the third degree do not produce the same end result, as the end result of assault is bodily injury, and harassment has no such result. 63 Haw. at 7, 620 P.2d at 254. The court further noted that the evidence in that case showed that the victim "suffered mental anxiety as a result of the incident, but not bodily injury as would result from assault." *Id.*

In this case, the circuit court relied on *Alston* as a basis for its determination that "the end result" of assault and murder are different because murder involves a "dead person" whereas assault involves "pure injury." [17] In *Alston*, the court found that the terroristic threatening offense and intimidating a witness offense have "distinct" end results. 75 Haw. at 535, 865 P.2d at 167. The court explained that "[t]heoretically, terroristic threatening produces a psychological injury to the person threatened," whereas "intimidating a witness results in the absence of the person threatened from an official

proceeding to which he or she was legally summoned." *Id.* (emphases added). "Stated differently in the context of the legislative classification, terroristic threatening produces a personal injury while intimidating a witness impairs the administration of a public function." *Id.* (emphasis added).

Thus, the focus in *Alston* was on the nature of the harm; i.e. psychological injury versus physical absence of the person from judicial proceedings. The court referred to the different legislative classification of the offenses as a way of emphasizing the distinct nature of the harm for each offense. This is similar to the court's approach in *Burdett*, in which the court explained that the end results of harassment and terroristic threatening are similar but distinct, because "terroristic threatening involves threats and psychological rather than actual physical harm, while the harassment statute seeks to preserve public peace and prohibits insults or challenges likely to provoke a violent or disorderly response." 70 Haw. at 89, 762 P.2d at 167.

Whereas *Kupau*, *Burdett*, and *Alston* involved offenses in which the end results were distinct due to the different legislative purposes for the offenses, assault and murder are both classified as offenses against the person, and both result in actual physical harm to a person. *Cf. State v. Kinnane*, 79 Hawai'i 46, 56, 897 P.2d 973, 983 (1995) (finding the end results of attempted sexual assault in the second degree and sexual assault in the fourth degree are the same because "[i]n both instances the victim is placed in jeopardy of being injured or is being injured by the defendant's conduct," even though sexual assault in the fourth degree "envisions a less serious injury or risk of injury [ (sexual contact) ] than attempted sexual assault in the second degree [ (risk of sexual penetration) ]"). The "end result" factor therefore weighs in favor of finding that assault in

---

17. The circuit court "combine[d]" *Alston* and *Robinson* to reach this conclusion. *Robinson*, however, was decided on the grounds that the defendant "points to evidence that the victim suffered bodily injury as well as serious bodily injury" but offered no theory under which the victim suffered only bodily injury and no serious bodily injury. 82 Hawai'i at 314, 922 P.2d at

368. In other words, the defendant in *Robinson* presented no evidence that she could be acquitted of assault in the first degree and convicted of assault in the third degree. *Id.* In this case, as discussed *infra*, there was sufficient evidence for the jury to conclude that Paul intentionally or knowingly committed assault but did not intend to cause Charles' death.

the first degree is a lesser included offense of murder in the second degree.

### 4.

Finally, the court may consider the legislative statutory scheme for both offenses in determining whether one is a lesser included offense of the other. This court has considered whether the offenses are placed in separate categories under the Hawai'i Penal Code. *See Kupau I*, 63 Haw. at 7, 620 P.2d at 254 ("the structure of the Hawai'i Penal Code places the offenses of harassment and assault in the third degree in separate categories," with the former placed in the chapter of "Offenses Against Public Order" and the latter placed in the chapter of "Offenses Against Persons"); *Alston*, 75 Haw. at 534, 865 P.2d at 166 ("terroristic threatening is classified as an offense against the person in HRS chapter 707, while intimidating a witness is classified as an offense against public administration in HRS chapter 710"). Separate classification of offenses under the Penal Code "indicates that different societal interests were intended to be protected[.]" *Kupau*, 63 Haw. at 7, 620 P.2d at 254.

In this case, assault in the first degree and murder in the second degree are both classified as offenses against persons under HRS Chapter 707.

### 5.

■ The analysis under HRS § 701–109(4)(c) demonstrates that assault in the first degree differs from murder in the second degree only in that assault in the first degree involves a less serious injury or risk of injury. Assault in the first degree does not have a mental state different from that required for murder in the second degree;

both require an intentional or knowing mental state. Both offenses have the same end result, given that both result in physical harm to the person. Assault in the first degree results in a lesser degree of harm than murder in the second degree. Finally, both offenses are part of the same legislative statutory scheme under "Offenses Against the Person." Thus, assault in the first degree is a lesser included offense of murder in the second degree under HRS § 701–109(4)(c).

### C.

■ The question then becomes whether there was a rational basis in the evidence to acquit Paul of murder in the second degree and convict him of assault in the first degree. *Flores*, 131 Hawai'i at 53, 314 P.3d at 130.

■ "Jury instructions on lesser-included offenses must be given where there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." *Id.* at 51, 314 P.3d at 128. "[J]urors are at liberty to believe all, none, or part of the evidence as they see fit." *Haanio*, 94 Hawai'i at 415, 16 P.3d at 256.

In this case, there was a rational basis for acquitting Paul of the murder charge and convicting him of assault in the first degree.[18] First, Paul testified that while he was trying to hurt Charles, he did not intend to kill him. Had the jury believed Paul's testimony, the jury would have had a rational basis for finding that Paul did not intentionally or knowingly cause Charles' death. Paul testified that he was trying to "hurt" Charles. Paul stated he did not know "how much" he was trying to hurt Charles. Paul also said

---

**18.** The dissent contends that "neither party here advocated for the approach taken by the majority." Dissenting Opinion at 469, 323 P.3d at 113. This is incorrect.

At trial, during the settlement of the jury instructions, defense counsel argued to the court that "an offense is so included when it differs from the offense charged only in the respect that a less serious injury or different state of mind suffices to establish its commission. That's exactly what we have here."

In his first point of the Statement of the Points Relied Upon, Paul argued that, "The requested

Assault instructions should have been submitted to the jury pursuant to HRS § 701–109(4)(a) as assault 'is established by proof of the same or less than all the facts required to establish' murder."

In the argument section of his Opening Brief, Paul stated the following: "Paul's requests from the lower court for first- and second-degree Assault as lesser-included offenses of Murder in the Second Degree is precisely because the Assaults involve 'less serious injuries to the same person,' and because they also involve a 'different state of mind indicating a lesser degree of culpability.'"

that "At that time I wasn't thinking. My mind was just —."

Additionally, the circumstances of the incident could have led the jury to believe that Paul did not intentionally or knowingly cause Charles' death. The offense was committed with a metal bar that kept the gate closed to keep the dogs in the yard, which provides some evidentiary support that Paul did not plan to intentionally or knowingly cause Charles' death.[19] Paul's initial focus was breaking the car windshield and windows and not on attacking Charles' person.

It also appears that Paul never opened the car door to attack Charles. Consistent with the attack being carried out through the window, Calvin testified that Paul was "poking" at Charles. Paul also testified that he "jabbed" or "was jabbing" at Charles.

While Paul acknowledged that he knew hitting someone in the head with the bar could cause death, he testified that at the time he was attacking Charles he did not aim for any particular part of Charles' body. Some of Charles' wounds were consistent with being attacked from outside the driver-side door and were described by Dr. Suzuki as "defensive type injuries." She also testified that there were no skull fractures.

The incident occurred at 9:00 or 9:30 at night. Paul described the scene as "dark." Similarly, a neighbor testified that "the street was dim. Where everything took place was very dark as well." Paul also testified that he "couldn't see blood." Under the circumstances, Paul may not have been aware where his jabs were landing.

Paul also testified that he intended to take Charles to the hospital when Debbie took the keys from the truck. Intending to take a person to the hospital would also provide evidentiary support that Paul did not intentionally or knowingly cause Charles' death. Furthermore, when Paul was in the truck and the keys were taken by Debbie, Paul was no longer in possession of the bar, as it had been taken from him by Calvin. Debbie also testified that when the incident ended Charles had a pulse and was breathing.

Furthermore, the testimony was conflicting as to whether Paul said he would kill Charles. Calvin testified that Paul said prior to the day of the incident that he would "kill" Charles if he ever saw him. However, Calvin acknowledged that Paul could have said "he don't know what might happen" if he saw Charles. Paul denied telling Calvin that Paul wanted to kill Charles. Debbie testified that, on the night of the incident, Paul said "many times" that "he going kill him" referring to Charles. However, Debbie admitted that she did not tell the police this information or include it in her written statement.

The jury would also have had a rational basis for believing that Paul was trying to protect Debbie by warning or punishing Charles. Paul testified multiple times that he believed that Charles was physically abusing Debbie. He testified that he was not jealous and the attack was "like trying to keep her safe, protect—protecting her." Paul testified that he "never like ... something happen to her" "[b]ecause [Charles] was hurting Debbie."

The jury's verdict in this case also indicates that the jury believed Paul did not intentionally or knowingly cause Charles' death. The jury convicted Paul of the included offense of reckless manslaughter, which rejects the conclusion that Paul intentionally or knowingly caused Charles' death. *See* HRS § 707–702(1)(a) (Supp.2006).

The court made its decision not to instruct the jury on assault based on its analysis of the law as interpreted though *Robinson* and *Alston*, not upon facts adduced at trial. The prosecution also argued against the inclusion of the assault charges based on an interpretation of law and not on the factual circumstances of the case.

The totality of the evidence showed a rational basis for acquitting Paul of murder in the second degree and convicting him of assault in the first degree. Because assault in the first degree is a lesser included offense of murder in the second degree, Paul was entitled to a jury instruction on assault in the first degree. The court's failure to give this

---

**19.** While plan is not an element of the offense of murder in the second degree, the lack of a plan may make it more likely that Paul did not intend to cause Charles' death.

instruction was not harmless beyond a reasonable doubt. *Flores,* 131 Hawai'i at 57, 314 P.3d at 134.[20]

Thus, the ICA erred in affirming the court's judgment because the court erred in failing to instruct the jury on the included offense of assault in the first degree.

### D.

The dissent contends that under the facts of this case that the jury "could not have" found that Paul committed assault in the first degree "without also finding that [Paul] consciously disregarded a substantial and unjustifiable risk that his conduct would cause [Charles'] death." Dissenting Opinion at 470, 323 P.3d at 114. In other words, the dissent is contending that the same evidence that would have permitted the jury to convict [Paul] of first degree assault would have also required the jury to convict him of reckless manslaughter. *Id.* at 470, 471, 323 P.3d at 114, 115.

This contention is incorrect both as a matter of law and of fact. First, as a matter of law, a jury's determination of intentionally or knowingly causing serious bodily injury does not provide any inference that the jury would have concluded that the defendant consciously disregarded a risk that the defendant's conduct would result in the injured person's death, much less that the manslaughter offense was required to have been proved for the jury to return an assault in the first degree verdict.

Second, as a matter of the facts adduced at trial, the contention that a finding of assault in the first degree in this case would require a jury to convict Paul of manslaughter is not correct.

Paul testified that at the time he was assaulting Charles he did not aim for Charles' head or for any particular part of Charles' body. In view of Paul's testimony, it was for the jury to judge the credibility of his statements and to assess Paul's actions before, during, and after the incident in light of all the other evidence to determine Paul's state of mind during the incident.

Nevertheless, the dissent maintains that the jury was required to find that Paul consciously disregarded the risk that the jabbing would cause Charles' death. As stated, however, Paul testified that he was not aiming for any particular part of Charles' body, and it appeared that Charles was trying to fend off the jabs and suffered "defensive injuries" but no skull fractures according to Dr. Suzuki. Paul never testified that he consciously disregarded the risk that his conduct would cause Charles' death, and in fact, his testimony essentially rejected such a contention as he indicated "At that time I wasn't thinking. My mind was just —."

Thus, it is the duty of a jury, and not an appellate court, to weigh such evidence; it would be contrary to fundamental principles of our jury system to hold, as the dissent urges, that as a matter of law the jury "could not have" found assault in the first degree "without also finding" that Paul consciously disregarded the risk that the jabbing would cause Charles' death.

It bears repeating that the jury in this case evaluated Paul's intent during the incident and, based upon its consideration of all the evidence, concluded that the government had not proved that Paul intended to cause Charles' death or that Paul was aware that his conduct was practically certain to have that result. Thus, it would appear that the jury did give some weight to Paul's testimony regarding the events.

However, because the jury was not permitted to consider assault in the first degree, the jury was compelled to either acquit Paul entirely or convict him of manslaughter. Since Paul had acknowledged that he had tried to hurt Charles for what Charles had done to Debbie and because the jury did not have an included offense alternative, the jury had little choice but to return a verdict of manslaughter. *Keeble v. United States,* 412 U.S. 205, 212–13, 93 S.Ct. 1993, 36 L.Ed.2d

---

**20.** As noted by Paul in his Application, the court interrupted Defense Counsel "during closing arguments when counsel was arguing to the jury that if they believed the instant matter was an assault case, then they should find Paul not guilty." The court interrupted to say that "Assault is not to be—assault is not a consideration." Denying defense counsel the ability to make this very argument highlights the harmful error caused by a failure to properly instruct the jury.

844 (1993) (requiring instruction on lesser-included offenses protects defendant from the danger that "[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubt in favor of conviction").

Unequivocally, this is not a case where the evidence requires a verdict of manslaughter where Paul's state of mind "remains in doubt." *Id.* Under the facts of this case, a jury may or may not determine that Paul "consciously disregarded" the risk that his conduct would cause Charles' death. But that decision is for a jury, and not for this court as a matter of law, as the dissent contends.[21]

## III.

Based on the foregoing, the ICA's and the circuit court's judgments are vacated and this case is remanded to the circuit court for a new trial.

## Dissenting Opinion by RECKTENWALD, C.J.

I respectfully dissent. The majority determines that there was a rational basis in the evidence for the jury to acquit Paul Kaeo of murder in the second degree and to convict him of assault in the first degree, and therefore a jury instruction on assault in the first degree was warranted. However, in my view, the relevant question is whether there was a rational basis in the evidence for a jury to acquit Kaeo of reckless manslaughter and convict him of assault in the first degree. Because I believe there was no such rational basis in the evidence, I would hold that the trial court properly refused to instruct the

jury on the lesser included offense of first degree assault.

Under HRS § 701–109(5) (1993), "[t]he court is not obligated to charge[1] the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." In other words, the statute requires a two step analysis: the court must find that the jury could acquit of the "offense charged" <u>and</u> that it could convict the defendant of the included offense. In my view, "charged offense" in this context must be read to include any included offenses that satisfy the HRS § 701–109(5) test. Otherwise, the trial court will necessarily be required to instruct on every possible included offense, as long as the jury could acquit of the offense that was specified in the indictment, information, or complaint. In the instant case, for example, the trial court would have been required to instruct on third degree assault,[2] which would be absurd since no rational jury could acquit Kaeo of first or second degree assault given the facts of this case.

The circuit court here instructed the jury with regard to second degree murder, as well as the lesser included offenses of reckless manslaughter and extreme mental or emotional distress manslaughter. That was appropriate, since a jury could have found that Kaeo did not intend to kill Kahumoku but that he recklessly caused Kahumoku's death.

However, with regard to whether to instruct on first degree assault, the relevant inquiry should be whether a jury could acquit on reckless manslaughter, but convict on first degree assault. The majority skips that step of the analysis, and instead relies solely on

---

**21.** In light of our determination that there was a rational basis in the evidence for the jury to acquit Paul of manslaughter and convict him of assault in the first degree, we do not address the dissent's reading of the term "charged offense" in HRS § 701–109(5).

**1.** "Charge" here refers to the trial court instructing the jury on the relevant laws to guide its deliberations. *See Black's Law Dictionary* 265 (9th ed. 2009) (defining "charge" as "[t]o instruct a jury on matters of law <the judge charged the jury on self-defense>").

**2.** HRS § 707–712 (1993) provides that:

   (1) A person commits the offense of assault in the third degree if the person:
    (a) Intentionally, knowingly, or recklessly causes bodily injury to another person; or
    (b) Negligently causes bodily injury to another person with a dangerous instrument.
   (2) Assault in the third degree is a misdemeanor unless committed in a fight or scuffle entered into by mutual consent, in which case it is a petty misdemeanor.

the fact that a jury could have acquitted Kaeo of second degree murder. *See* majority opinion at 465, 466–67, 323 P.3d at 109, 110–11. Although the majority states in a footnote that it has determined that "there was a rational basis in the evidence for the jury to acquit [Kaeo] of <u>manslaughter</u> and convict him of assault in the first degree," majority opinion at 468 n. 21, 323 P.3d at 112 n. 21 (emphasis added), the majority's analysis nevertheless would appear to require an instruction on assault if there was a rational basis in the evidence for acquitting Kaeo of <u>second degree murder</u> and convicting him of first degree assault. Majority opinion at 465–67, 323 P.3d at 109–11. Respectfully, in my view, this analysis is incorrect for the following reasons.

Notably, neither party here advocated for the approach taken by the majority. Although Kaeo clearly argued that first degree assault is a lesser included offense of second degree murder, *see* majority opinion at 465 n. 18, 323 P.3d at 109 n. 18, both Kaeo and the State recognized that, in determining whether the circuit court should have <u>instructed the jury</u> with regard to first degree assault, the relevant inquiry was whether Kaeo could have been acquitted of reckless manslaughter. For instance, in Kaeo's reply brief in the ICA, he argued that "there existed a rational basis in the evidence for the jury to acquit [Kaeo] of murder in the second degree <u>and reckless manslaughter</u> and to convict him of either assault in the first degree or

assault in the second degree." (Emphasis added). Additionally, the State argued in its answering brief to the ICA that "there [was] no rational basis to support the contention that the jury could have rationally acquitted Defendant of Reckless Manslaughter and convicted him of Assault in the First Degree or Assault in the Second Degree." Thus, both Kaeo and the State acknowledged that the trial court would only be obligated to give a first degree assault instruction if the evidence would enable the jury to acquit him of reckless manslaughter and convict him of first degree assault.

Given the facts of the case, there was no rational basis [3] to acquit Kaeo of reckless manslaughter while convicting him of first degree assault. "A person commits the offense of manslaughter if … [h]e recklessly causes the death of another person." HRS § 707–702(1)(a) (Supp.2009). "A person acts recklessly with respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result." HRS § 702–206(3)(c) (1993). In contrast, "[a] person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person." HRS § 707–710 (1993). "Serious bodily injury" is defined as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the

---

**3.** For there to be a "rational basis" in the evidence to acquit the defendant of the offense charged and convict the defendant of the included offense, the evidence must allow the jury to simultaneously acquit of one offense and convict of another in a way that is consistent. Stated differently, if the jury must credit particular evidence to convict a defendant of the lesser offense, it cannot be said that it might have discredited that same evidence to acquit the defendant of the greater offense.

For example, in *State v. Powell*, 154 P.3d 788 (Utah 2007), the Utah Supreme Court applied a nearly identical statutory provision to HRS § 701–109(5), *see* Utah Code Ann. § 76–1–402 (West 2013), which states that "[t]he court shall not be obligated to charge the jury with respect to an included offense unless there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense[,]" to hold that the defendant was not entitled to instructions on aggravated assault or assault as lesser included offenses of attempt-

ed murder because the "evidence did not provide a rational basis for acquitting of attempted murder while simultaneously convicting of assault or aggravated assault." *Id.* at 797. In reaching its decision, the court rejected the defendant's argument that the jury could have potentially disbelieved the witnesses' testimony for the purposes of acquitting him of attempted murder but believed the same portion of testimony to convict him of assault. Thus, the court stated that

> [t]here is no basis in the record upon which the jury could have simultaneously credited the testimony necessary to establish the lesser offense and rejected the very same testimony insofar as it established the greater offense. In other words, there was no rational basis in the evidence for the jury to accept the witnesses' testimony as establishing assault or aggravated assault while rejecting that same testimony as establishing attempted murder.

*Id.* at 798 (internal quotation marks, footnote, and ellipses omitted).

function of any bodily member or organ." HRS § 707–700 (1993).

I agree with the majority that the jury could have found that Kaeo intentionally or knowingly caused serious bodily injury to Kahumoku when he beat Kahumoku with the rebar pipe, but did not intend to cause Kahumoku's death. However, under the facts of the case, I believe the same evidence that would have provided a rational basis for the jury to convict Kaeo of first degree assault also would have provided a rational basis to convict him of reckless manslaughter, given that his knowing and intentional assault of Kahumoku led to Kahumoku's death. Stated differently, the jury could have found that Kaeo intentionally or knowingly caused serious bodily injury to Kahumoku when he beat Kahumoku with the rebar pipe, but did not intend to cause Kahumoku's death. However, the jury could not have done so without also finding that Kaeo consciously disregarded a substantial and unjustifiable risk that his conduct would cause Kahumoku's death.

The uncontroverted evidence showed that Kaeo forcefully beat Kahumoku, and that Kaeo's beating caused Kahumoku's death. The evidence showed that Kahumoku had several "circular injuries" from "blunt type force" on his forehead, his nose, and the left side of his jaw. Kahumoku also suffered multiple injuries to his chest and neck, and "elongated abrasions" on his forearm consistent with being struck. When the medical examiner who performed the autopsy on Kahumoku's body, Dr. Gayle Suzuki, was asked

if one of the elongated injuries could have been caused by the tip of the pipe dragging along the skin, she testified that such a dragging motion would have caused a scraping rather than the seven-inch contusion. Thus, Dr. Suzuki testified that the elongated injury was consistent with Kahumoku being hit by the length of the pipe rather than jabbed with it.

In addition, Kahumoku had internal injuries, including bruises underneath his scalp, a bruise on the left side of his forehead, and bleeding or hemorrhaging to the back whole left side of his brain. Referring to her autopsy report, Dr. Suzuki thus concluded to a reasonable medical degree of certainty that the cause of Kahumoku's death was the head injuries Kahumoku suffered as a result of Kaeo's attack.[4] Kaeo did not dispute the injuries that he inflicted on Kahumoku, and that these injuries resulted in Kahumoku's death.[5]

It is the province of the jury to weigh the evidence, and the jury may accept or reject any of the evidence presented to it. *See State v. Chen,* 77 Hawai'i 329, 338, 884 P.2d 392, 401 (App.1994). Nevertheless, the jury must act within the confines of the law, and may not consider a lesser included offense unless the instruction is provided because there is a rational basis in the evidence for acquitting the defendant of a greater offense and convicting of a lesser. HRS § 701–109(5).

---

4. Dr. Suzuki also ruled out the possibility that Kahumoku could have died from natural disease or alcohol concussion syndrome. She explained that alcohol concussion syndrome did not apply to Kahumoku's death because the case studies on the syndrome all involved cases in which elevated alcohol combined with "evidence of head trauma but no injury of the brain." (Emphasis added). In contrast to such cases of alcohol concussion syndrome, Kahumoku's death did involve brain injury. Thus, Dr. Suzuki testified that, regardless of whether or not alcohol played a contributing factor, Kahumoku's death was caused by the brain injuries he suffered as a result of Kaeo's attack, not alcohol concussion syndrome.

Notably, in closing arguments, Kaeo's attorney argued that the testimony on alcohol concussion syndrome did not go to causation but instead went to whether Kaeo intended to kill Kahumo-

ku. Kaeo's attorney stated that alcohol concussion syndrome:

was a contributing factor. So it matters. Why is this important? Is it important because, well, it changes the end result? No, absolutely not. But it affects the intent. Remember, this case is about intent, right? So if you think, eh, you know what, [Kaeo], he put a beating on [Kahumoku] and then he died so, you know, that's intentionally or knowingly. No, no, no, no. [Kaeo] intended, yeah, I going put a beating on this guy but I had no intent to kill him. (Emphasis added).

5. Kaeo twice admitted that he killed Charles Kahumoku Jr. When asked at trial, "You killed him, correct," Kaeo answered, "Correct." Later during his testimony, Kaeo again acknowledged that his beating of Kahumoku was the cause of Kahumoku's death.

Here, in rejecting the charge of murder in the second degree, the jury necessarily concluded that Kaeo did not intentionally or knowingly cause Kahumoku's death. *See* HRS § 707–701.5. It is beyond dispute that the evidence, and in particular Kaeo's testimony, provided a rational basis for the jury to so conclude. However, in my view, there was no such rational basis for the jury to conclude that Kaeo intentionally or knowingly caused serious bodily injury to Kahumoku (i.e., assault in the first degree), but did not consciously disregard a substantial and unjustifiable risk that his conduct would cause Kahumoku's death (i.e., reckless manslaughter). Thus, the evidence does not meet the criteria set forth in HRS § 701–109(5) for requiring the trial court to instruct on a lesser included offense. I therefore respectfully disagree with the majority's assertion that this issue involves one of credibility that should be reserved for the finder of fact. *See* majority opinion at 467–68, 323 P.3d at 111–12.

Finally, the majority relies on several factors that provide a rational basis for acquitting Kaeo of second degree murder and convicting him of first degree assault. However, these same factors provide a rational basis for convicting Kaeo of manslaughter. The majority points to the following evidence, each of which provides a rational basis for a manslaughter verdict: Kaeo's testimony that he "was trying to hurt [Kahumoku, but] did not intend to kill him"; that Kaeo committed the offense with a bar for keeping the gate closed, "which provides some evidentiary support that [Kaeo] did not plan to intentionally or knowingly cause [Kahumoku's] death"; and that "the testimony was conflicting as to whether [Kaeo] said he would kill [Kahumoku]." *See* majority opinion at 466, 323 P.3d at 110. Finally, to show that the jury could acquit Kaeo of second degree murder, the majority highlights the fact that the "jury convicted [Kaeo] of the included offense of reckless manslaughter, which rejects the conclusion that [Kaeo] intentionally or knowingly caused [Kahumoku's] death." Majority opinion at 466, 323 P.3d at 110. However, none of these factors provide a rational basis for acquitting Kaeo of reckless manslaughter and convicting him of first degree assault.

In conclusion, in this particular case, there was no rational basis for a jury to render a verdict acquitting Kaeo of reckless manslaughter but convicting him of assault in the first degree. Accordingly, HRS § 701–109(5) did not obligate the trial court to charge the jury with respect to first degree assault.[6] Because the trial court did not err in refusing to instruct the jury on first degree assault, I would affirm the judgment of the Intermediate Court of Appeals.

6. Moreover, although the majority concludes that the trial court made its decision not to instruct based on its analysis of the law and not upon the facts adduced at trial, *see* majority opinion at 466, 323 P.3d at 110, the record indicates that the circuit court did consider the evidence. In explaining its decision not to instruct on assault, the trial court noted two circumstances in which an assault instruction may be warranted in a homicide case: (1) when there are several co-defendants and it is unclear who inflicted what kind of injury; and (2) where there is a dispute as to causation. The trial court noted that "those two exceptions don't apply here."

Although the commentary to Model Penal Code § 1.07(4)(c), upon which HRS § 701–109(4) is based, states that the section "allows conviction of an offense consisting of an intentional infliction of bodily harm where the charge is intentional homicide," the rest of the passage reveals that an assault instruction is normally permitted when the question of causation of the homicide is in doubt, which was not the case here:

Paragraph (c) allows conviction of an offense consisting of an intentional infliction of bodily harm where the charge is intentional homicide, a problem that has caused courts considerable difficulty because an element that is required to establish the lesser offense may not be necessary to establish the greater. It arises most frequently where a person is charged with criminal homicide and there is a doubt as to whether his blow was the cause of death. Under those circumstances the state or the defendant may request an instruction on assault and battery. Some courts have refused to allow such an instruction to be given, while others have held such an instruction to be proper. Since a basic premise of the Code is that it is desirable, whenever possible, to adjudicate the entire criminal liability of the defendant in a single trial, it seems sensible, for example, to allow a conviction for assault and battery where the question of causation in a homicide case is in doubt.

Model Penal Code § 1.07 cmt. (1985) (footnotes omitted).