Electronically Filed
Intermediate Court of Appeals
CAAP-14-0001337
20-FEB-2018
11:16 AM

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---o0o---


STATE OF HAWAIʻI, Plaintiff-Appellee,
v.
HERWIN MAGBULOS, Defendants-Appellees.


NO. CAAP-14-0001337


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 13-1-0696)


FEBRUARY 20, 2018


NAKAMURA, C.J., and FUJISE and GINOZA, JJ.

OPINION OF THE COURT BY NAKAMURA, C.J.

Plaintiff-Appellee State of Hawaiʻi (State) charged
Defendant-Appellant Herwin Magbulos (Magbulos) with second-degree
murder for intentionally or knowingly causing the death of
Darryle Wong (Wong). Wong resided in an improvised structure in
a homeless encampment underneath a freeway viaduct. While in
Wong's dwelling, Magbulos stabbed Wong in the stomach and back
with two different knives, causing Wong's death. The State
asserted that the stabbings were unprovoked and constituted
murder; Magbulos asserted that he stabbed Wong in self-defense.

The jury found Magbulos guilty as charged. The Circuit Court of the First Circuit (Circuit Court)[1] sentenced Magbulos to life imprisonment with the possibility of parole.

On appeal, Magbulos contends: (1) the prosecutor committed misconduct during opening statement by stating that despite Wong's homelessness and drug use, Wong's life mattered; (2) the prosecutor committed misconduct in closing argument by improperly vouching for the credibility of the State's witnesses and inviting jurors to consider Magbulos' interest in the case in evaluating his credibility; and (3) the Circuit Court erred by failing to instruct the jury on the lesser included offenses of second-degree assault, third-degree assault, and third-degree assault by mutual affray. As explained below, we conclude that the alleged misconduct by the prosecutor and alleged error by the Circuit Court did not violate Magbulos' right to a fair trial by an impartial jury, and we affirm Magbulos' conviction.

BACKGROUND

The stabbing that led to Wong's death took place at about daybreak on Sunday morning at a homeless encampment underneath the Nimitz/Dillingham interchange in Mapunapuna. Wong lived there in a separate enclosed structure that used the cement foundation of the viaduct for its ceiling and a portion of its walls and wooden pallets for the remaining walls. Wong's enclosed structure contained an opening in the wooden pallets for a door, a bed, a toilet area with a bucket, and cardboard and pieces of carpet on the floor. Magbulos stabbed Wong while they were in Wong's dwelling.

The State's witnesses at trial included people who lived at or frequented the encampment, and who, like Wong, were homeless and used drugs. Magbulos had previously stayed at the encampment with one of Wong's neighbors, and Magbulos was also a drug user.

---

[1] The Honorable Dexter D. Del Rosario presided.

2

I.

The State presented the following evidence at trial.

A.

Michael Lund (Lund) testified that on Friday, May 3, 2013, he went to visit Wong at the encampment. Lund had known Wong for at least three years, but had not seen Wong for some time. Lund was homeless and brought some of his possessions with him and stayed with Wong.

According to Lund, he asked Wong to procure drugs, and Wong provided what Lund believed was a "twenty dollar paper of methamphetamine." Lund injected the drugs on Friday afternoon, which made him feel sick. Lund stayed in or around Wong's dwelling through Saturday morning. During that time, Lund did not sleep and did not see Wong sleep. Lund remained at Wong's dwelling on Saturday. He observed Wong leave the dwelling several times and return after being gone for hours.

Lund began feeling better on Saturday and that night, after midnight, he left Wong's dwelling to get something to eat and drink. Lund returned to Wong's dwelling at around 1:30 to 2:00 a.m. on Sunday. When Lund returned, Wong left the dwelling and did not come back until hours later, when "daybreak was starting." When Wong came back, Lund tried to talk to Wong, but Wong was tired and lay down on his bed. Lund had not seen Wong sleep at all between Saturday and when Wong came back on Sunday morning.

Shortly after Wong lay down on his bed, Magbulos entered Wong's dwelling.[2] Magbulos asked Lund for a cigarette, and then Magbulos sat on a cooler next to Wong's bed and smoked it. Magbulos did not appear agitated, and Wong did not react to

_____

[2] Lund was unable to identify Magbulos at trial, but without objection by Magbulos, the prosecutor referred to the person Lund testified had entered Wong's dwelling as "the defendant" and "Herwin" (Magbulos' first name). There was no dispute at trial that this person was Magbulos as Magbulos himself acknowledged that he had stabbed Wong in Wong's dwelling while Lund was present. So for purposes of simplicity, in recounting Lund's testimony, we will refer to this person as "Magbulos."

3

Magbulos' entering the dwelling.  Magbulos tried to talk to Wong, but Wong remained on his bed and "just kind of mumbl[ed]" in response.  Another person, whom Lund did not know, called from outside without entering the dwelling, asking to talk to Wong.  However, Wong would not get up, and Lund told the person to leave.

Magbulos, Wong, and Lund remained in the dwelling.  Wong was tossing and turning in his bed, and Lund was next to his possessions that had been placed in a corner of Wong's dwelling.  Lund's attention was drawn back to Wong when he heard something that sounded like a grunt.  Lund looked towards Wong and saw him "going into the fetal position[.]"  Lund then saw Magbulos strike Wong in the back with a "pummeling overhand" motion.  Wong jumped up in his bed and began shouting and "yelling at the top of his lungs[.]"  Magbulos then backed away from Wong and towards Lund.  Prior to Magbulos striking Wong, Lund did not observe Wong do or say anything to provoke Magbulos, and during the incident, Lund did not see Wong strike or do anything to Magbulos.

After striking Wong, Magbulos left the dwelling, but then stepped back into the dwelling because a crowd had gathered outside.  At that point, Lund observed a knife, with a "long blade," which was a "little under a foot," in Magbulos' left hand.  Lund could not see Magbulos' other hand.  Wong kept yelling, "Get him out of here.  Get him out of here[,]" and Magbulos subsequently left the dwelling.

After Magbulos left, Wong said to call 911 and fell to the ground.  Lund saw a wound on Wong's chest and another on his back.  The wound on Wong's back was bleeding, and Lund applied pressure to it.  While doing so, Lund also saw injuries on Wong's left arm.  After a while, police and other emergency personnel arrived and took over.

B.

Derek Vesper (Vesper) testified that he had known Wong for a little over a year.  According to Vesper, Wong had helped

Vesper when Vesper was homeless, and he felt indebted to Wong. On the day of the stabbing incident, before daylight, Vesper went to visit Wong to bring him food, because Vesper heard that Wong had not eaten in some time. Vesper saw Wong outside. Wong looked "[v]ery tired and exhausted," and Wong asked whether Vesper could help Wong by buying a bike from Wong. Vesper test drove the bike for about fifteen minutes. When Vesper returned, Wong was no longer outside, so Vesper called into Wong's dwelling. A voice Vesper did not recognize told him to come back later. Before leaving, Vesper negotiated with and paid the unknown speaker fifty dollars for the bicycle.

As he was leaving, Vesper was confronted by Nelson Cablay (Cablay), one of Wong's neighbors in the encampment, who scolded Vesper for making noise while others were still sleeping. Vesper apologized. Vesper again started to leave. When he was about twenty feet away from Wong's dwelling, he heard a "loud . . . excruciating scream" coming from the dwelling. The screams continued, and Cablay told Vesper to go help Wong. Vesper headed back to Wong's dwelling, and numerous people living in the encampment came out and went towards Wong's dwelling to investigate.

Then, someone told Vesper to "watch out . . . [h]e's behind you." Vesper turned and saw Magbulos bending down with "[t]wo knives in his hands" looking back towards Wong's dwelling. The knife in Magbulos' right hand appeared to be a large "kitchen" knife with a blade that was a little over twelve inches. The knife in Magbulos' left hand was smaller, and "maybe about three, four inches" of the blade were sticking out of Magbulos' hand. Magbulos' hands and arms were covered with blood.

Vesper told Magbulos, "I don't want no trouble[,]" and Magbulos responded, "[D]on't make no sudden moves." Cablay came over and said to Magbulos, "[W]hat you doing?" . . . [G]et out of here." Cablay also told Magbulos that "the police are coming."

Magbulos yelled, "Let that fucker die," and then Magbulos fled the scene.

Vesper went with Cablay to check on Wong. Vesper saw Wong on the ground, going into convulsions, spurting blood from different wounds, and breathing "really fast." Vesper got on the bicycle to find a phone so he could call the police. As Vesper was pedaling towards a U-Haul business, he saw Magbulos. At that point, Magbulos did not have any knives in his hands. Vesper found someone with a phone who called the police. When the police arrived, Vesper led them to Wong's dwelling.

C.

Cablay testified that on the day in question, he was living in the encampment underneath the viaduct about twenty yards away from Wong's dwelling. Cablay had been living there for four years and had known Wong for seven years. Cablay had known Magbulos for about four months, and Magbulos had previously stayed with Cablay off and on for "maybe two, three months."

According to Cablay, sometime in the late night or early morning before the stabbing incident, when it was still dark outside, Magbulos came to Cablay's dwelling and woke Cablay up. Magbulos told Cablay that "he was gonna fight somebody." Cablay did not think that Magbulos was talking about Wong. Magbulos then left, and Cablay went back to sleep.

Later that morning, Cablay's girlfriend woke Cablay up and said, "They fighting over there." Cablay testified that he heard Wong "screaming . . . for help," and he did not hear Wong say anything else.[3] After he heard Wong screaming, Cablay went to Wong's dwelling and saw Magbulos inside. Magbulos walked out of Wong's dwelling and came within five feet of Cablay. Cablay saw Magbulos holding two knives, one in each hand. The longer knife, with a blade about ten inches, was in Magbulos' right

---

[3] On cross-examination, Cablay acknowledged that in his statement to the police, he stated that he heard Wong say, "Get the fuck out of the tent already. I told you, I gonna take care of it already."

6

hand, and the shorter knife, with a blade about three or four inches, was in his left hand. Cablay later recognized the longer knife as a knife from his kitchen when Cablay checked his kitchen and the knife was missing.

As Magbulos was leaving Wong's dwelling, Cablay asked Magbulos, "[W]hat you doing there?" Cablay testified that Magbulos replied, "F you, Let him die."[4]

D.

Magbulos' brother, Hermangildo Magbulos (Hermangildo), testified that Magbulos was his oldest brother. Hermangildo testified that at about 9:00 to 9:15 a.m. on the day of the incident, Magbulos showed up at Hermangildo's residence. Magbulos appeared scared and nervous and asked to be allowed to come inside the residence. Because Hermangildo's mother told him not to let his brother come in, Hermangildo told Magbulos that he could not come inside and asked Magbulos to leave.

After receiving a description of Magbulos, Honolulu Police Department Officer Tyler Parson (Officer Parson) apprehended Magbulos at a laundromat at approximately 1:30 p.m. on the day of the stabbing. Officer Parson testified that it is standard procedure for the police to determine the nature and extent of an arrestee's injuries. Officer Parson did not observe any injuries on Magbulos, Magbulos did not complain of any injuries, and Magbulos did not move, act, or behave as though he was injured.

Wong was taken by ambulance to the Queen's Medical Center at approximately 6:36 a.m., and he was pronounced dead at approximately 6:49 a.m. The following morning, William Goodhue, M.D. (Dr. Goodhue), a forensic pathologist, performed an autopsy on Wong. Dr. Goodhue testified that Wong had sustained a stab wound to his front upper abdomen, two slash wounds to his left

[4] On cross-examination, Cablay acknowledged that in his statement to the police, he stated that Magbulos said, "Fuck him. Let him die. He like fuck me up."

7

arm, and a stab wound to his back near his left shoulder blade. The direction of the stab wound to Wong's upper abdomen was from front to back, up to down, and left to right, and it penetrated Wong's body to a depth of 3.5 inches. The wound had a "forked" appearance, which indicated that the knife was twisted in Wong's body or that Wong moved while the knife was inside him. This wound did not cut into any vital organs or blood vessels and was not fatal.

Dr. Goodhue next described two incised or slash wounds to Wong's left forearm and the crease of his left elbow. Dr. Goodhue opined that these wounds were consistent with defensive wounds -- wounds that "[w]ould reasonably be interpreted as occurring as Mr. Wong tried to defend himself by interposing his left arm between the oncoming blade and his body[.]"

Dr. Goodhue concluded that the stab wound to Wong's left upper back was the "fatal" wound and the cause of Wong's death. This wound was 7.5 inches deep. The direction of the wound was from Wong's back to his front, up to down, and left to right. The wound went through Wong's diaphragm and through his spleen, and it cut into his aorta, which is "the main blood vessel taking blood from the heart to the rest of the body." As a result of the cut to his aorta, Wong bled to death.

Dr. Goodhue testified that the wounds Wong sustained were consistent with being inflicted by a knife that was sharpened on one side. Dr. Goodhue did not find any abrasions or contusions to Wong's hands, elbows, or knees that would be consistent with Wong attacking or assaulting someone.

Wong's postmortem toxicology blood tests were positive for methamphetamine and cannabis. Dr. Goodhue testified that Wong's methamphetamine level was 330 nanograms per milliliter. Dr. Goodhue concluded that the methamphetamine contributed to Wong's death because it accelerated the bleeding from his aorta. However, this did not alter Dr. Goodhue opinion that the stab wound to Wong's back was the cause of his death. Dr. Goodhue

determined that given the severity of the stab wound to Wong's back, Wong would have died even if there was no methamphetamine in his system when he was stabbed. Dr. Goodhue noted that Wong had a documented history of mental illness, including schizophrenia and bipolar disorder.

II.

Magbulos presented the following evidence at trial.

A.

Hanin Davalos (Davalos) lived in the encampment underneath the viaduct and knew Wong. About a month prior to Wong's stabbing, Davalos witnessed an incident between Wong and a woman who had stolen Wong's cooler which contained all his food. Wong hit the woman with a "two-by-four," "[n]ot as hard as he could," but still "one good crack" that caused the woman to return the cooler.[5]

B.

Magbulos, with the aid of an Ilocano interpreter, testified in his own defense. Magbulos immigrated to Hawai'i from the Phillippines when he was 12 years old. Magbulos testified that he was 25 and acknowledged that Wong was significantly older than him. After dropping out of high school in tenth grade, Magbulos worked at food establishments. At some point, he got into drugs.

Magbulos testified about his version of the events which led to Wong's stabbing. According to Magbulos, after midnight, he went to the encampment underneath the viaduct to buy drugs from Cablay. Magbulos went to Cablay's place, but no one answered. As Magbulos was leaving, Wong threw something at Magbulos that missed, and Wong asked Magbulos what he was doing there. Magbulos knew Wong, but they were not particularly close. Magbulos told Wong that he wanted to buy drugs from Cablay, but Cablay was not there. Wong told Magbulos to give him money and

---

[5] Photographs taken at the scene after Wong's stabbing showed what appears to be a two-by-four piece of wood on the floor.

he would buy the drugs. Magbulos gave Wong $30 to buy "ice" (methamphetamine), and Wong told Magbulos to wait by Wong's dwelling.

Magbulos waited a long time before Wong returned. Wong appeared very restless to Magbulos. Wong asked Magbulos to help him carry a cabinet from down the street back to Wong's place. Magbulos helped Wong, but the cabinet was heavy and they left it on the road. Magbulos asked Wong if he had purchased the drugs, and Wong told Magbulos to come inside Wong's dwelling. When Magbulos entered the dwelling, he saw Lund, who had a head light on his forehead, which was the only lighting inside. Wong told Magbulos to sit on the cooler, and Wong, who appeared tired, lay down on his bed. Magbulos got a cigarette from Lund. When he finished smoking the cigarette, Magbulos again asked Wong if Wong had gotten the drugs.

According to Magbulos, Wong got up and went to get something underneath the bed. Wong then approached Magbulos, who was still siting on the cooler, and hit Magbulos with something, which Magbulos believed was a piece of wood, about two and a half feet long. Magbulos raised his left arm, and the blow hit Magbulos on the upper arm and nicked his head. Wong and Magbulos pushed each other, Magbulos grabbed Wong's hand, and Wong dropped the wood. Wong pushed Magbulos to the ground, and Wong put his hand on Magbulos' neck. They grappled with each other on the ground.

At some point, Wong stood up and went to get the wood. It was then that Magbulos saw a knife and grabbed it. After grabbing the knife, Magbulos remembered that he had brought a small knife with him, because he knew "there are many troublemakers in that place." Magbulos showed Wong the two knives to scare him. Wong raised the wood to attack Magbulos. To defend himself, Magbulos stabbed Wong in a "one and two combination." Magbulos stabbed Wong in the front with the smaller knife that was in Magbulos' left hand, then reached

around and stabbed Wong in the back with the larger knife that was in Magbulos' right hand. Wong stopped attacking Magbulos and began screaming. Magbulos ran to the door, which had previously been blocked by Wong.

Magbulos testified that he was not fighting or angry with Wong prior to Wong attempting to hit him with the wood. In particular, Magbulos claimed that it did not bother him that Wong took his money and did not give him anything in return. Magbulos was shown photographs taken of him after his arrest. He testified that an abrasion and bruising to his left arm were caused by Wong hitting him with the wood. He also identified scratches on his back as having been sustained when Wong pushed him to the ground.

C.

Edward Fisher, Ph.D (Dr. Fisher), an expert in pharmacology and toxicology, examined Wong's autopsy report. Dr. Fisher testified that methamphetamine increases aggressiveness and that the very high level of methamphetamine found in Wong's blood had "been correlated with individuals who show aggressive and irrational behaviors." However, Dr. Fisher acknowledged that there was insufficient information to claim a causal link between chronic methamphetamine use and violent behavior. Dr. Fisher opined that Wong's history of schizophrenia and bipolar disorder also increased the risk of irrational psychotic behaviors. Dr. Fisher stated that although methamphetamine use and a history of bipolar disorder increase the risk of aggressive and psychotic behavior, he could not say what behavior they would cause on any particular occasion.

IV.

The jury deliberated for about an hour and ten minutes (excluding its recess for lunch) before informing the Circuit Court that it had reached a verdict. The jury found Magbulos guilty as charged of second-degree murder. The Circuit Court

11

sentenced Magbulos to life imprisonment with the possibility of parole, and it entered its Judgment on November 15, 2014. This appeal followed.

DISCUSSION

I.

Magbulos contends that the prosecutor committed misconduct during opening statement by emphasizing that despite Wong's homelessness and drug use, Wong's life mattered. Magbulos asserts that the prosecutor's remarks were improper because they constituted argument during opening statement and "induced the jury to decide the case on their emotions instead of the facts and the law." We conclude that the remarks challenged by Magbulos do not warrant vacating his conviction.

A.

The prosecutor's remarks challenged by Magbulos were made at the beginning and the end of his opening statement. Magbulos objected three times on the basis that the prosecutor's remarks constituted argument or were argumentative, and the Circuit Court sustained the objections. Magbulos did not move to strike the prosecutor's remarks or seek a curative instruction. The remarks challenged by Magbulos on appeal have been highlighted in the quoted material. The prosecutor began his opening statement as follows:

> Fuck him. Let him die. That's what the defendant said seconds after stabbing Darryle Wong. Fuck him. Let him die. Seconds after he plunged a ten-inch kitchen knife into his back. Fuck him. Let him die. As he lay there on the ground, bleeding to death, his aorta sliced open. Left there to die, like he didn't matter.
>
> **And yes, Darryle Wong was homeless. And he matters. And yes, Darryle Wong was a drug user. And he matters. And yes, Darryle Wong is now dead. And still, he matters. He matters because, whether homeless or not, whether a drug user or not, he was a person. He was a person who did not deserve to die, a person who did not deserve to be brutally murdered.**
>
> [Defense Counsel]: Objection, Your Honor. This is argument.
>
> THE COURT: Sustained.

After the Circuit Court sustained Magbulos' objection, the prosecutor proceeded to recount in great detail what he expected the evidence would show through the testimony of the State's witnesses. The trial transcripts reveal that the prosecutor's opening statement went on for about ten pages without drawing any objection from Magbulos. The prosecutor then ended his opening statement as follows:

> Now, on May 5th, 2013, the City and County of Honolulu, State of Hawai'i, Herwin Magbulos plunged the knife into Darryle's back, severing his aorta and causing his death. **And then he left him there to die, like he didn't matter**.
>
> [Defense Counsel]: Objection, argumentative.
>
> THE COURT: Sustained.
>
> [Prosecutor]: The State is going to ask that, after you consider the evidence, **you show him that it does matter**.
>
> [Defense Counsel]: Objection, argumentative.
>
> THE COURT: Sustained.
>
> [Prosecutor]:  You show him that he's guilty, and find that he is guilty.  Convict him as charged, murder in the second degree.

### B.

Although the challenged remarks appear to be argument, and thus more appropriate in closing argument than opening statement, the Circuit Court sustained Magbulos' objections. The crux of Magbulos' prosecutorial misconduct claim is that the theme of the prosecutor's opening statement -- that Wong's life mattered -- was improper because it "inflame[d] the passions or prejudices of the jury" and "us[ed] an argument . . . that was calculated to appeal to the jurors' emotions." We disagree with Magbulos' contention. The rather obvious and self-evident statement that the life of a person who had been killed matters does not serve to improperly inflame the passions or prejudices of the jury or cause a case to be decided on an improper basis.

By their nature, trials are emotional, especially trials involving a victim whose life has been lost. It is not

13

improper for a prosecutor to present evidence or make arguments that causes the jury to feel emotion; it is only improper to make gratuitous appeals to the jury's passion, prejudice, or emotion that have no legitimate bearing on issues relevant to the case. See State v. Bruce, SCWC-15-0000439, 2017 WL 4480038, at *9-12 (Hawai'i Oct. 9, 2007); State v. Kiakona, 110 Hawai'i 450, 457-59, 134 P.3d 616, 623-25 (App. 2006).

In Bruce, the defendants were charged "with offenses arising from their alleged involvement in and benefit from the activities of a prostitute, the complaining witness (CW)." Id. at *1. The CW testified that defendants were her pimps who used physical violence and other means to intimidate and control her to ensure that she would continue working for them as a prostitute. Id. at *2-4. In closing argument, the defendants attacked the CW's credibility. In response, the prosecutor in his rebuttal closing argued:

> So this whole thing about [CW] lying and can't be believed, well, the only people who can't be believed was [defense witness] Keshawn Stewart and [defendant] Mr. Bruce. The fact of the matter is that they treated her like she was property.
>
> . . . .
>
> . . . They didn't see her as any thing more than a piece of property to pass around, to mistreat, to humiliate, intimidate, beat, and force. That is how they viewed her, that is how they treated her. But she's not a piece of property. I mean, she's somebody's daughter, she's somebody's friend, she's a mother, she's a woman, she is a person, and she deserves to be treated properly [.]

Id. at *5 (emphasis and some brackets in original).

The Hawai'i Supreme Court held that the prosecutor's comments did not constitute an improper plea to the jury's passions and prejudices and did not constitute misconduct. The supreme court distinguished its prior decision in State v. Rogan, 91 Hawai'i 405, 984 P.2d 1231 (1999), concluding that unlike in Rogan, the prosecutor's remarks in Bruce: (1) "did not constitute an improper appeal to the jury's emotions that bore no objectively legitimate purpose," but were relevant to the State's

"overarching theme and theory of the case"; and (2) did not constitute an improper invitation to the jury to put themselves in the .CW's place, but rather were a summation of facts that, in the State's view, supported the charges against the defendants. Bruce, 2017 WL 4480038 at *10-11.

Here, the prosecutor's theory of the case was that Magbulos, without provocation, stabbed Wong to death over a $30 drug transaction. Magbulos defense was that he acted in self-defense and that the State's witnesses, many of whom, like Wong, were homeless and drug users, were not believable. The prosecutor's statements that Wong's life mattered, notwithstanding his homelessness and drug use, was relevant to the overarching theory and theme of the prosecution -- that Magbulos held so little regard for Wong's life that without justification or provocation, Magbulos felt it was permissible to stab Wong to death. The prosecutor's statements were also relevant to counteract any possible prejudice the jury may have felt against Wong or the State's witnesses due to their homelessness and drug use, by reminding the jury that the lives of all people matter and have value, regardless of whether they are homeless or use drugs. Thus, unlike in Rogan, the prosecutor's statements were not gratuitous attempts to appeal to the prejudices of the jury on matters having no legitimate bearing on the case, but were directly tied to the State's overarching theory of the case and were relevant to issues in dispute. See Bruce, 2017 WL 4480038, at *11 (concluding that viewed in context, it was not improper for the prosecutor to argue "that as a human being, CW did not deserve to be treated like a piece of property"). Although the prosecutor's statements would have been more appropriate in closing argument, we conclude that they do not warrant vacating Magbulos' conviction.

C.

In this regard, we observe that our adversarial system of justice is founded on the principle that strong advocacy by

each side is the best way to uncover the truth. The appellate courts should not attempt to micro-manage the trial process, the trial judge, or advocacy by the trial participants. For our adversarial system to work, both parties and their counsel must be given leeway to strongly advocate their positions to the jury. Imposing undue restrictions on what a prosecutor can say, or making every occasion in which an appellate court believes the prosecutor made an objectionable statement the basis for overturing a conviction, will skew the appropriate adversarial balance. This will be detrimental to the proper functioning of the adversarial system and the principal purpose of criminal trials -- to search for and find the truth.

Even if improper in opening statement, the prosecutors' challenged remarks were relatively innocuous. It is self-evident that every person's life matters, regardless of whether the person is homeless or a drug user, and that no one deserves to be murdered. The same remarks by the prosecutor would have been permissible in closing argument.

No trial is perfect, and during a typical trial, both prosecutors and defense counsel, in advocating their side of the case, make numerous remarks or ask questions that are found objectionable by the trial court. Jurors understand that the prosecutor and defense counsel are not disinterested actors, but that their role is to strongly advocate for their side. The appellate court should not exaggerate the impact that brief remarks by the prosecutor, found objectionable by a trial court as part of the routine give and take of trial, had on the outcome of a case. The trial court's sustaining of a defense counsel's objection to a prosecutor's remark indicates to the jury that the remark should be disregarded. We conclude that in this case, the prosecutor's challenged remarks, which merely expressed self-evident propositions, did not prejudice the defendant's right to a fair trial and do not justify overturning Magbulos' conviction. See State v. Mara, 98 Hawaiʻi 1, 16, 41 P.3d 157, 172 (2002)

16

("Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." (internal quotation marks and citations omitted)).

## II.

Magbulos contends that the prosecutor committed misconduct in closing argument by improperly vouching for the credibility of the State's witnesses and inviting jurors to consider Magbulos' interest in the case in evaluating his credibility. We conclude that the prosecutor did not improperly vouch for the credibility of the State's witnesses and that any impropriety in inviting the jurors to consider Magbulos' interest in the case in evaluating his credibility was harmless.

### A.

The prosecutor's comments in closing argument that are challenged by Magbulos arose in the following context.

The prosecutor began his closing argument in a manner similar to his opening statement, arguing that Magbulos, without provocation or remorse, stabbed Wong to death:

> Fuck him. Let him die. It comes down to that again. Because that's what the defendant did. He stabbed him two times. Once in the abdomen, 3.5 inches deep, top to bottom, front to back, and left to right. Then again he stabbed the defendant in the back, with a ten-inch kitchen knife, going 7 and a half inches deep, through his rib cages, or his rib cage, through his diaphragm, through his spleen, eventually slicing his aorta. Again, up to down. Left to right. And this time, back to front.
>
> Then after this, as [Wong] is on the ground bleeding to death, his aorta having been cut, this is no remorse. There is no How can we help? There is no regret. There is Fuck him. Let him die.
>
> Now, that alone, you can see this was not a fight. Okay. This was not self defense. This was the defendant coming in, sitting feet away from [Wong] for 15 minutes, calmly, coolly smoking a cigarette, before stabbing him twice.
>
> This was a cold and deliberate murder.

The prosecutor then recited the elements the State had to establish to prove the charged second-degree murder, and he

17

discussed the facts that were not in dispute, including that Magbulos caused the death of Wong by stabbing him. Although the prosecutor argued that Magbulos' actions and the evidence showed that Magbulos' intent to cause death was clear and that there was no self-defense, he noted the defense may disagree. With respect to self-defense, the prosecutor argued that if the jury believed the State's witnesses, Lund, Vesper, and Cablay, there was no issue of self-defense. In particular, the prosecutor noted that Lund, who was present when the stabbing occurred, testified that there was no fight, Wong did not know he was about to be stabbed, and that Magbulos inflicted the fatal blow to Wong's back while Wong was in "the fetal position."

The prosecutor argued that in evaluating Magbulos' self-defense claim, the jury would have to evaluate the credibility of the witnesses who testified. Citing the jury instructions, the prosecutor stated that included in the things the jury should consider in evaluating a witness's credibility were "the extent to which the witness is supported or contradicted by other evidence; the probability or improbability of the witness's testimony; and the witness's interest, if any, in the result of the case." The prosecutor then proceeded to argue these credibility factors to the jury. The prosecutor argued that Magbulos' version of events was contradicted by the State's witnesses, but noted that the mere fact that one witness's testimony is contradicted by another witness does not tell you which witness to believe. Thus, the prosecutor argued that what was more important was that the physical evidence corroborated the State's witnesses and contradicted Magbulos' testimony.

In particular, the prosecutor argued that the angle of Wong's stab wounds to the abdomen and back were consistent with Lund's testimony, but inconsistent with Magbulos' testimony and Magbulos' in-court demonstration of how he claimed he stabbed Wong in self-defense with a one-two combination. The prosecutor

18

attacked Magbulos' claim that Magbulos' post-arrest photos corroborated his testimony that Wong struck him with a piece of wood, arguing that the photographs depicted well-developed scabs and bruising that were too old to have come from injuries suffered earlier that day. The prosecutor also attacked Magbulos' version by arguing that the location of the blood stains at the scene did not jibe with Magbulos' testimony about the location of the stabbing, and that Magbulos' testimony does not account for the defensive wounds on Wong's left arm.

The prosecutor then discussed the "improbabilities in the defendant's story." The prosecutor argued that this included Magbulos' testimony that he did not know Wong very well, but decided to give Wong $30 to buy drugs; that he was not bothered or upset by Wong's failure to come back with any drugs; and that Wong was so tired that he could not finish moving the cabinet, but then minutes later Wong, who was much older than the 25-year-old Magbulos, became restless and could summon the power to hold Magbulos down. The prosecutor asserted that in contrast, the testimony of Lund, Vesper, and Cablay, who had not been in contact with each other,[6] were consistent with each other regarding the significant details. He further argued that the testimony of these witnesses was consistent with Magbulos' testimony, except that Magbulos' testimony differed on matters that would show he was guilty and did not act in self-defense. The prosecutor also argued that Magbulos' actions showed consciousness of guilt, including Magbulos' hiding of the knives and his statement, "Fuck him, let him die."

At this point in his closing argument, the prosecutor made the following comments, with the comments challenged by Magbulos on appeal highlighted in the quoted material:

> Just quickly, I'll go into in the interests or bias.
> You know, when we talked in voir dire, almost to a person,

---

[6] The prosecutor argued that Vesper testified he did not know Lund and that Lund testified that he had not spoken to Cablay since the day in question.

everyone who we talked about when we -- both Defense Counsel and **the State asked what's the reason people lie, everyone's number one reason, so you don't get in trouble. Not going to spend too much time on that. That one's obvious. He has an interest in the case. Self protection**.

Now, on the flip side of that, again, not going to insult you by saying that State's witnesses were perfect. Okay. You heard them go up there. They occasionally left things out that they didn't think were important. And they didn't say the same story exactly the same way.

. . . There's difference in perspective. There's differences in when you tell the same story, of course, tell the same story over and over, a good attorney, like [Magbulos' counsel], is going to be able to find something that you didn't tell exactly the same way. And in this case he did just that. He found something that wasn't exactly the same.

Now, I'd ask you when you're considering these, call them inconsistencies, I guess, to be fair, okay, to think about some of the instructions that you will also get about how to consider those. But first I'd -- **I guess I would suggest to you that they're credible for more than just because they came across as the more credible witnesses, and because the State's saying that they're the more credible witnesses**.

Look at what the underlying facts are. Okay. Their story are not just consistent with each other. They're consistent with the defendant. Okay. **Again, the only parts where they become inconsistent is where the defendant has to change the story to make him not guilty**.

Now, also remember that we talked about those broad strokes, okay, that everybody's going to get it wrong if you had to say it over and over. But clearly, in each and every one of their statements and in their testimony, the broad strokes are identical. They saw the defendant walking out, with a huge knife. And in [Lund's] case, that he saw him not self defense, not fight, but stab [Wong] in the back.

**Now, also, the State's witnesses, I would argue and submit to you, do not have that interest or bias, that incentive to lie that the defendant has**.

[Defense Counsel]: Your Honor, I'm going to object at this point. State v. Bashom [sic].

THE COURT: Overruled.

[Prosecutor]: Okay. So, again, [Cablay] was a friend to the defendant. Okay. He has no reason to try and put the knife in his hands. He let him stay in his house. He was living with him. Okay. [Wong is] a neighbor, true. But [Cablay] has no incentive to favor anyone. Okay. He just called it like he saw it.

Same, [for Lund] and [Vesper]. They indicated they didn't even know who the defendant was. What incentive do they have to pin it on someone they didn't even know?

> Because it's not like we're talking about a balance, like maybe [Wong is] going to get in trouble. Okay. It's the cold reality is [Wong is] dead. He's not going to be getting in trouble for anything that happened that day. There is no reason to lie about what his role was. Okay. It's not going to help him.

The prosecutor then discussed the instruction that in weighing the effect of inconsistencies or discrepancies, the jury can consider whether they concern matters of importance or unimportant detail and whether they result from innocent error or deliberate falsehood; argued that any inconsistencies in the testimony of the State's witnesses did not indicate that they were lying; discussed the self-defense instruction and argued that Magbulos was not justified in using deadly force; and discussed lesser included offenses. The prosecutor concluded the opening portion of his closing argument by stating:

> So at this point, I'll leave it at that. It's clear from the credible evidence that the defendant's testimony is in fact just a fabrication to try and get him out of trouble. Okay. All the physical evidence, as well of course all the State's witnesses, unequivocally suggest -- not suggest, require I would argue, that the jury find him guilty of murder, as charged.

### B.

With respect to Magbulos' claim that the prosecutor improperly personally vouched for the credibility of the State's witnesses, we conclude that this claim is without merit. Magbulos did not object to the prosecutor's alleged "personal vouching" comment, and thus, he has the burden of showing plain error.

Viewed in context, the message conveyed by the prosecutor's comment was that the jury should not find that the State's witnesses were more credible than Magbulos simply because the State was making this argument, but because the factors relevant to the jury's assessment of credibility supported that conclusion. Prior to making the alleged "personal vouching" comment, the prosecutor had engaged in a prolonged argument explaining that the State's witnesses were more credible than Magbulos because their testimony was consistent with, and

21

Magbulos' testimony was inconsistent with, the physical evidence presented at trial, and because Magbulos' version of the events was improbable. The prosecutor's statement that Lund, Vesper, and Cablay were credible "for more than just because they came across as the more credible witnesses, and because the State's saying that they're the more credible witnesses," was a prelude to the prosecutor's additional arguments, based on the evidence presented at trial, that the testimony of the State's witnesses were consistent with each other in significant detail and that these witnesses did not have a bias or an interest to testify falsely. Based on this context, and viewing the prosecutor's closing argument as a whole, we conclude that the stray comment challenged by Magbulos did not constitute improper personal vouching for the credibility of the State's witnesses.

C.

Citing State v. Basham, 132 Hawai'i 97, 319 P.3d 1105 (2014), Magbulos contends that the prosecutor engaged in misconduct by arguing that Magbulos had an interest in the case and an incentive to lie that the State's witnesses did not have. Magbulos argues that under Basham, a generic argument that a defendant was not credible because he or she had an interest in the outcome of the case and thus a motive to lie was impermissible, and that the prosecutor's argument in this case was improper under Basham. To properly evaluate Magbulos' claim, a history of the development of the law on this issue is instructive.

1.

Prior to Basham, the long established rule in Hawai'i was that it was permissible for the prosecutor to argue that a defendant's interest in the outcome of the case gave him or her a motive to lie. In State v. Apilando, 79 Hawai'i 128, 142, 900 P.2d 135, 149 (1995), the defendant Apilando argued that it was improper for the prosecutor to attack Apilando's credibility in closing argument by stating that because Apilando "had the

highest stake in the outcome of the case, he had the greatest motive to lie." The Hawai'i Supreme Court rejected Apilando's argument, reasoning as follows:

> This court has held that, when a defendant takes the stand to testify, his or her credibility can be tested in the same manner as any other witness. State v. Pokini, 57 Haw. 17, 22, 548 P.2d 1397, 1400 (1976); see also HRE 609.1(a) (1985) (Generally, "the credibility of a witness may be attacked by evidence of bias, interest, or motive.") Apilando testified on his own behalf, and, by so doing, subjected himself to attacks on his credibility. We believe the prosecution's comments regarding Apilando's interest in the case were not improper. See, e.g., People v. Dall, 207 Ill. App.3d 508, 527, 152 Ill. Dec. 442, 453, 565 N.E.2d 1360, 1371 (prosecutor's statement that defendant had better motive than victim to lie was not error), appeal denied, 139 Ill.2d 599, 159 Ill. Dec. 111, 575 N.E.2d 918 (1991); People v. Bunyard, 45 Cal.3d 1189, 249 Cal. Rptr 71, 92-94, 756 P.2d 795, 816-18 (1988) (prosecutor's argument that defendant was an "interested party" and had motive to lie in order to avoid conviction deemed appropriate); Walls v. State, 560 A.2d 1038, 1049 (Del.) (proper for prosecutor to argue that defendants were biased because they had a big stake in the outcome of the case), cert. denied, 493 U.S. 967, 110 S.Ct. 412, 107 L.Ed.2d 377 (1989).

Apilando, 79 Hawai'i at 142, 900 P.2d at 149 (emphases added.)

However, twenty years later, in Basham, the supreme court majority *sua sponte* addressed this issue, which had not been raised by the parties. At trial, the prosecution began closing argument by stating that two of the State's witnesses were "completely credible" and then stating that Aliikea Basham (Aliikea), one of the co-defendants who testified, had "no reason to tell the truth." Basham, 132 Hawai'i at 115, 319 P.3d at 1123.[2] The supreme court noted that at that point in the closing

---

[2] As quoted in Basham, the prosecutor's closing argument was as follows:

On behalf of the prosecution, I adamantly state to you, that Mr. and Mrs. Bloom [(the alleged victim and his wife)] have been completely credible witnesses, that they are worthy of your belief. They have no axe to grind, no revenge to be had. They did not know the Defendants Basham before this incident. They have absolutely no reason to fabricate or otherwise make up the accounts that they have recited to you in explicit detail.

Defendant Aliikea Basham, on the other hand, has decided to testify, which is his right. When a defendant testifies, his credibility is to be weighed as any other witness. But you need to keep something in mind. Defendant Aliikea Basham has absolutely no reason to tell you the truth. So the selection or

(continued...)

argument, the prosecutor had not discussed any of the testimony presented at trial or offered any reason, based on the evidence, other than Aliikea's status as a defendant, for why Aliikea would have no reason to tell the truth. Id. at 116, 319 P.3d at 1124. The supreme court held that "the implication of the prosecutor's argument" was that Aliikea "had no reason to tell the truth because he was a defendant in the case." Id. at 115-16, 319 P.3d at 1123-24.[8/] The supreme court concluded that such general comments about a defendant's credibility based solely upon his or her status as the defendant were improper. The supreme court held that

> it is improper for a prosecutor in summation to make generic arguments regarding credibility based solely upon the status of a defendant. Walsh, 125 Hawaii at 285, 260 P.3d at 364 ("Because fundamental rights are infringed when generic tailoring arguments are made, generic tailoring arguments are subject to plain error review."). Accordingly, a prosecutor may not argue during closing argument that defendants, because they are defendants, have no reason to tell the truth or have the "greatest motive to lie." Apilando, 79 Hawai'i at 142, 900 P.2d at 149.

Id. at 118, 319 P.3d at 1126.

Although the supreme court majority cited Apilando as the source of the "greatest motive to lie" quote, it did not expressly overrule Apilando in its decision. It also did not discuss the Apilando decision, other than a "but see" citation to its statement that prosecutors are bound to refrain from expressing their personal views as to the credibility of the

---

[7/] (...continued)
the choice before you in weighing the credibility of the witness is this. Your willingness to believe two people who have no reason to lie to you versus one person who has no reason to tell you the truth.

Basham, 132 Hawai'i at 104, 319 P.3d at 1112 (emphasis omitted).

[8/] The petitioner before the supreme court was Michael Basham, Aliikea's father, who did not testify at trial. The supreme court concluded that "while the prosecutor's argument was specifically directed at Aliikea, the statement implicated [Michael] Basham as well. Basham, 132 Hawai'i at 116, 319 P.3d at 1124.

witnesses.[9] However, we conclude that Basham overrules Apilando, at least with respect to Apilando's holding that it was not improper for the prosecutor to argue that because Apilando "had the highest stake in the outcome of the case, he had the greatest motive to lie."[10]

2.

The Basham majority's failure to expressly overrule Apilando, and, in particular, to specify exactly what aspects of Apilando's analysis it was overruling, creates questions concerning how to apply Basham to this case. Did the Basham majority intend only to prevent the prosecutor from arguing that a defendant has a motive to lie due to his or her interest in the outcome of the case, or did the Basham majority intend a broader holding that it is improper for the jury to consider the defendant's interest in the outcome of the case in assessing the defendant's credibility? Each interpretation is problematic.

A person's self-interest is widely recognized as a relevant factor to consider in evaluating the person's

---

[9] The "but see" citation to Apilando appears in the Basham majority opinion in the following context:

> It is well-established "under Hawai'i case law that prosecutors are bound to refrain from expressing their personal views as to a defendant's guilt or the credibility of witnesses." Clark, 83 Hawai'i at 304, 926 P.2d at 209 (citations omitted). See State v. Marsh, 68 Haw. 659, 660, 728 P.2d 1301, 1302 (1986); State v. Cordeiro, 99 Hawai'i 390, 424-25, 56 P.3d 692, 726-27 (2002); Tuua, 125 Hawai'i at 14, 250 P.3d at 277. But see State v. Apilando, 79 Hawai'i 128, 142, 900 P.2d 135, 149 (1995) (prosecutor's comment that defendant "had the greatest motive to lie" because he had the "highest stake in the outcome of the case" was permissible attack on defendant's credibility).

Basham, 132 Hawai'i at 115, 319 P.3d at 1123.

[10] We note that the Basham majority began its discussion of the issue by stating that the prosecutor's argument in closing that Aliikea had no reason to tell the truth came before the prosecutor had discussed any trial testimony or offered any reason based on the evidence for why Aliikea would have no reason to tell the truth. Thus, it could be argued that the prohibition against a prosecutor's arguing that a defendant has a motive to lie because of his or her interest in the outcome of the case is only triggered when a prosecutor makes this argument without first discussing trial evidence or attacking the defendant's credibility based on evidence presented at trial. However, we believe that such an argument would be difficult to reconcile with the Basham majority's subsequent, more unconstrained analysis.

credibility. The precept that people are inclined to act in ways that further their own interests is reflected in Hawaii Rules of Evidence (HRE) Rule 609.1 (2016), which establishes the general rule that "[t]he credibility of a witness may be attacked by evidence of bias, interest, or motive. It is also reflected in judicial precedent which holds that "[b]ias, interest, or motive is always relevant[.]" State v. Estrada, 69 Haw. 204, 220, 738 P.2d 812, 823 (1987). Precluding the jury from considering a defendant's interest in the outcome or result of the case in evaluating the defendant's credibility will require the jury to ignore a factor that is "always relevant" in evaluating credibility. It would therefore impair and impede the truth-seeking purpose of the criminal justice system.

On the other hand, if the jury can consider the defendant's interest in the outcome of the case as a relevant factor in evaluating the defendant's credibility, it is unclear why a prosecutor should be precluded from arguing this factor.

In choosing between these alternative interpretations of Basham, we note that the Basham majority focused on the role of the prosecutor in its analysis, prefacing its holding with the phrase, "Given the prosecutor's important role in our justice system . . . ." Basham, 132 Hawai'i at 118, 319 P.3d at 1126. Indeed, the specific holding of Basham is that "it is improper for a prosecutor in summation to make generic arguments regarding credibility based solely upon the status of the defendant" and that "a prosecutor may not argue during closing argument that defendants, because they are defendants, have no reason to tell the truth or have the greatest motive to lie." Id. (emphasis added; internal quotation marks and citation omitted). Furthermore, Basham did not address whether it was permissible for the jury to consider the defendant's interest in the outcome of the case in assessing the defendant's credibility. Basham also did not specifically overrule the Apilando court's conclusion that "when a defendant takes the stand to testify, his

26

or her credibility can be tested in the same manner as any other witness." Apilando, 79 Hawai'i at 142, 900 P.2d at 149.[11/]

For these reasons, we conclude that Basham should be read narrowly to only preclude the prosecutor from making the generic argument regarding the defendant's interest in the outcome of the case, and not to prevent the jury from considering the defendant's interest in the outcome of the case in evaluating his or her credibility. Interpreting Basham in this manner, we conclude that the prosecutor's Basham error was harmless and did not prejudice Magbulos' right to a fair trial.

Because the jury could legitimately consider Magbulos' interest in the case, the error is limited to the prosecutor's arguing that Magbulos had an interest and incentive to lie. We conclude that the effect of this error on the jury was not substantial. The prosecutor's argument on this point was brief. The prosecutor spent the vast majority of his closing argument focusing on other factors, which were based on evidence presented at trial, to support his assertion that Magbulos' testimony was not credible. This included the prosecutor's arguments that Magbulos' testimony was inconsistent with the physical evidence presented at trial; that Magbulos' testimony conflicted with the testimony of the State's witnesses, including Lund, who was present and witnessed the stabbing; and that Magbulos' version of events was improbable. The Circuit Court also instructed the jurors that they were "the sole and exclusive judges of the effect and value of the evidence, and of the credibility of the

---

[11/] We note that the standard Hawai'i Criminal Jury Instructions (HCJI) provide that "[w]hen a defendant testifies, his/her credibility is to be tested in the same manner as any other witness." HCJI § 3.15 (1991). The HCJI further provide that "[i]n evaluating the weight and credibility of a witness's testimony," the jury may consider a number of factors, including "the witness's interest, if any, in the result of the case[.]" HCJI § 3.09 (2000). If Basham were read to preclude a jury from considering a defendant's interest in the result of the case in evaluating his or her credibility, HCJI § 3.15, which has been in effect since 1991, may have to be amended to read something like: "When a defendant testifies, his/her credibility is to be tested in the same manner as any other witness, except that, unlike other witnesses, the defendant's interest in the result of the case shall not be considered."

witnesses" and that it was their "exclusive right to determine whether and to what extent a witness should be believed, and to give weight to his or her testimony accordingly." Finally, the evidence supporting Magbulos' conviction was strong. Magbulos admitted that he stabbed Wong in the stomach and back. Magbulos did not dispute that the stab to Wong's back, which penetrated to a depth of 7.5 inches, caused Wong's death. Lund, an eyewitness to the stabbing, testified that Magbulos stabbed Wong without provocation and not in self-defense. Wong had cuts to his left arm that were consistent with defensive wounds; Magbulos' version of events did not specifically account for these defensive wounds; and Magbulos did not suffer any significant injury.

For these reasons, we conclude that the prosecutor's Basham error was harmless. We also conclude, based on our preceding analysis, that the cumulative effect of the alleged misconduct of the prosecutor in opening statement and closing argument did not affect Magbulos' substantial rights and do not justify overturning his conviction.

III.

The Circuit Court instructed the jury on the lesser included offenses of reckless manslaughter and first-degree assault, but denied Magbulos' request to instruct the jury on the lesser included offenses of second-degree assault, third-degree assault, and third-degree assault by mutual affray. Magbulos argues that the Circuit Court erred in failing to instruct on the lower-level assault offenses. We conclude that any error in failing to instruct on the lower-level assault offenses was harmless.

A.

The development of the law on this issue includes the following.

In State v. Haanio, 94 Hawai'i 405, 16 P.3d 246 (2001), the supreme court held that the trial court is required to "instruct juries as to any included offenses having a rational

28

basis in the evidence" regardless of what the parties desire. Haanio, 94 Hawai'i at 407, 16 P.3d at 248. The supreme court reasoned:

> A trial court's failure to inform the jury of its option to find the defendant guilty of the lesser offense would impair the jury's truth-ascertainment function. Consequently, neither the prosecution nor the defense should be allowed, based on their trial strategy, to preclude the jury from considering guilt of a lesser offense included in the crime charged. To permit this would force the jury to make an "all or nothing" choice between conviction of the crime charged or complete acquittal, thereby denying the jury the opportunity to decide whether the defendant is guilty of a lesser included offense established by the evidence.

Id. at 415, 16 P.3d at 256 (block quote format altered; citation omitted). The supreme court, however, further held that the trial court's error in failing to instruct the jury on a lesser included offense "is harmless when the jury convicts the defendant of the charged offense or of an included offense greater than the included offense erroneously omitted from the instructions." Id.

In State v. Flores, 131 Hawai'i 43, 44, 314 P.3d 120, 121 (2013), the supreme court overturned this latter holding in Haanio, and it ruled that the trial court's failure to instruct on a lesser included offense is not automatically harmless error when the jury returns a guilty verdict on a greater offense. In reaching this result, the supreme court concluded that rendering the failure to instruct on a lesser included offense always harmless whenever the jury finds the defendant guilty of a greater offense would leave "the jury with the same 'all or nothing' choice that had been condemned in Haanio." Flores, 131 Hawai'i at 56, 314 P.3d at 133.

In State v. Kaeo, 132 Hawai'i 451, 323 P.3d 95 (2014), the supreme court applied its new rule in Flores to overturn Kaeo's manslaughter conviction. Kaeo had been charged with second-degree murder, but was convicted of the lesser included offense of reckless manslaughter. Kaeo, 132 Hawai'i at 460, 323 P.3d at 104. The supreme court vacated the manslaughter

29

conviction on the ground that the trial court had erred in failing to instruct on the lesser included offense of first-degree assault. The supreme court concluded that there was a rational basis in the evidence to acquit Kaeo of second-degree murder and to convict him of first-degree assault based on the evidence presented at trial, which included Kaeo's testimony that he was trying to hurt, but did not intend to kill, the victim who ultimately died. Id. at 465-67; 323 P.3d at 109-11.

B.

Here, the jury, after being instructed on the lesser included offenses of reckless manslaughter and first-degree assault, convicted Magbulos of the charged offense of second-degree murder. Thus, unlike in Flores and Kaeo, the failure of the Circuit Court to instruct on the lower-level assault offenses did not present Magbulos' jury with an "all or nothing" choice between the guilty verdict it rendered and a "complete acquittal." Instead, the jury had the option of finding Magbulos guilty of manslaughter or finding him guilty of first-degree assault, but chose to find him guilty as charged of second-degree murder.

Under these circumstances, we need not consider whether there was a rational basis in the evidence to acquit Magbulos of second-degree murder and convict him of the lower-level assault offenses because we conclude that any error in failing to instruct on the lower-level assault offenses was harmless beyond a reasonable doubt. While the failure to instruct on a lesser included offense just below the offense for which the jury returned a guilty verdict is not automatically harmless error, we conclude that absent unusual circumstances, the failure to instruct on a lesser included offense two levels below the offense for which the defendant is found guilty will ordinarily be harmless. In this case, Magbulos is contending that the failure to instruct on lesser included offenses that are at least three levels below the second-degree murder for which the jury

30

found him guilty entitles him to a new trial. It strains credulity to believe that the jury who found Magbulos guilty as charged of second-degree murder, despite being instructed on the lesser included offenses of manslaughter and first-degree assault, might reasonably have found him guilty of the lower-level assault offenses if instructed on these offenses. We therefore conclude that there is no reasonable possibility that the Circuit Court's failure to instruct on the lower-level assault offenses affected the outcome of this case.

CONCLUSION

For the foregoing reasons, we affirm the Circuit Court's Judgment.

On the briefs:

Jon N. Ikenaga
Deputy Public Defender
for Defendant-Appellant

Brian R. Vincent
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

31